324 P.3d 951

**KAUAI SPRINGS, INC.,
Petitioner/Appellant–
Appellee,**

v.

**PLANNING COMMISSION OF the
COUNTY OF KAUA'I, Respondent/Appellee–Appellant.**

**No. SCWC–29440.**

Supreme Court of Hawai'i.

Feb. 28, 2014.

Robert H. Thomas and Mark M. Murakami, Honolulu, for petitioner.

Alfred B. Castillo, Jr., Lihue, Mauna Kea Trask, David J. Minkin, and Dayna H. Kamimura–Ching, Honolulu, for respondent.

Issac Moriwake, on the brief for *Amici Curiae* Mālama Kaua'i and Hawaii's Thousand Friends.

Jon M. Van Dyke, Honolulu, Ernest M. Kimoto, on the brief for *Amicus Curiae* Office of Hawaiian Affairs.

NAKAYAMA, ACOBA, McKENNA, and POLLACK, JJ., with RECKTENWALD, C.J., concurring and dissenting.

Opinion of the Court by POLLACK, J.

This appeal arises out of a decision by Respondent/Appellee–Appellant Planning Commission of the County of Kaua'i (Planning Commission) to deny Petitioner/Appellant–Appellee Kauai Springs, Inc.'s (Kauai Springs) application for three permits related to the continued operation of Kauai Springs' water bottling facility. The Circuit Court of the Fifth Circuit (circuit court) reversed in part and vacated in part the Planning Commission's decision and order, ordered that all three permits be issued, and entered final judgment in favor of Kauai Springs. The Intermediate Court of Appeals (ICA), pursuant to its published opinion of April 30, 2013, vacated the circuit court's final judgment and remanded the case to the Planning Commission for consideration of whether Kauai Springs can meet the requirements for the permits. Kauai Springs filed an application for writ of certiorari to this court (Applica-

tion), seeking reversal of the ICA's May 30, 2013 Judgment on Appeal.

For the reasons set forth herein, we affirm the ICA Judgment to the extent that it vacated the Final Judgment entered by the circuit court and remand the case to the Planning Commission to clarify its findings of fact and conclusions of law.

## I. BACKGROUND

Kauai Springs is a water bottling and distribution company owned by Jim and Denise Satterfield. Kauai Springs operates out of land located in Koloa, Kaua'i (the Property). The Property is leased from Makana Properties, LLC (Makana Properties). The majority of the Property is designated agricultural by the General Plan for the County of Kaua'i (Kaua'i General Plan), Chapter 7 of the Kaua'i County Code (KCC).

On April 17, 2003, the County of Kaua'i (County) issued Kauai Springs a Class IV Zoning Permit for the construction of a watershed on the Property. On September 17, 2003, the County issued a building permit to Kauai Springs for the construction of a 1,600 square-foot "bottled water processing facility" on the Property. On July 9, 2004, the State Department of Health issued a four-year permit approving Kauai Springs as a "bottled water manufacturer."

Kauai Springs subsequently began operating its water bottling facility. The water that Kauai Springs uses for its operations originates from an underground spring located several miles from the Property, 1,000 feet up Kahili Mountain.[1] Kauai Springs apparently "purchases" or "licenses" its water from EAK Knudsen Trust (Knudsen Trust), the owner of the land where the spring is located. The water is transmitted to the Property by a private, gravity-fed system dating back to the 1890s, which is owned by Knudsen Trust and operated by Grove Farm Company (Grove Farm).[2]

Grove Farm owns the private water tank servicing the Property. The water tank

---

1. Contrary to the findings of the circuit court, the EAK Knudsen Trust does not "own the spring [or] the water." *See, e.g., In re Water Use Permit Applications*, 94 Hawai'i 97, 129, 9 P.3d 409, 441 (2000) ("a public trust was imposed upon all the waters of the kingdom. That is, ... not owner-

ship in the corporeal sense ... rather, ... a retention of such authority to assure the continued existence and beneficial application of the resource for the common good.").

2. According to the State Public Utilities Commission (PUC), "[t]he Grove Farm water system

feeds several lines and services at least eleven other residences neighboring the Property. Kauai Springs has installed a tap into the water line connected to the tank, which feeds a meter and an underground line to the water bottling facility on the Property. Water overflows from the tank into a tributary to Waihohonu Stream. Kauai Springs purifies the water it extracts, bottles the water into five-gallon containers, and delivers the bottles to customers on Kaua'i.

On May 15, 2006, the County Planning Department (Planning Department) issued a cease and desist letter to Makana Properties. The letter provided that upon receiving a complaint, the Planning Department conducted a field inspection of the Property on April 27, 2005, and found violations of KCC Chapter 8, The Comprehensive Zoning Ordinance for the County of Kauai (CZO).[3] The Planning Department specified that 1) the "activity of processing and packaging without the proper permits" constitutes a violation of KCC § 8–19.1 [4]; and 2) the use of the Property "for Industrial processing and packaging purposes is not generally permitted within the Agriculture District," pursuant to KCC § 8–7.2.[5] Makana Properties was instructed to immediately "[c]ease and desist such use and relocate to an appropriate land use district."

On July 5, 2006, the Planning Department accepted Kauai Springs' completed application for three zoning permits: 1) a Use Permit under KCC Article 20 (Use Permit); 2) a Special Permit under Hawai'i Revised Statutes (HRS) § 205–6 (2005) (Special Permit); and 3) a Class IV Zoning Permit under KCC Article 19 (Class IV Zoning Permit). According to the Planning Department, a Use Permit and Special Permit were required because the proposed use was not generally permitted in the agricultural district. A Class IV Zoning Permit is a procedural requirement of a Use Permit in the agricultural district.

Kauai Springs' application provided that it was "requesting a permit for a water harvesting and bottling operation." The application stated that the "maximum current capacity for the Kauai Springs' operation is 1,000 [five-gallon] bottles per day during one 8 hour shift." Kauai Springs estimated that it "expect[ed] vehicle capacity to reach a maximum level of 8 trips per day by delivery and office personnel." Furthermore, Kauai Springs planned to expand its operation to include bottling water in smaller bottles for distribution throughout the State.

The Planning Commission held four public hearings on the application, on August 8, September 26, November 14, and November 28, 2006. The Commission also discussed the application at a regular meeting on January 23, 2007. Public oral testimony on the application was taken at each meeting. The minutes of the hearings indicate that Kauai Springs' application was identified at each hearing as follows: "Use Permit U–2007–1, Special Permit 2007–1 and Class IV Zoning Z–IV–2007–1 = Kaua'i Springs, Inc. (For a spring water bottling facility, Koloa, Tax Map Key 2–8–2:por. 5.)." There is no indication in the record that members of the public were restricted to testifying on any particular permit at any of the hearings. Many of those testifying commented generally on the application as a whole rather than on the permits individually.

Additionally, the Planning Department also requested input from various State and

---

originates at one of two tunnels located on the land owned by the [Knudsen Trust] at the foot of Mount Kahili.... The water line delivers water to Kahili Mountain Park and a number of domestic and agricultural users on various Knudsen Trust-owned and other parcels on its way to Koloa Town, where it supplies at least eleven residential lots on Wailaau Road."

3. On December 3, 2012, the County of Kauai enacted the first of two phases of updating the CZO, which had not been comprehensively updated since its adoption in 1972. Ordinance No. 935 (Dec. 3, 2012), *available at* http://qcode.us/codes/kauaicounty/.

4. KCC § 8–19.1 (1972) provides: "No person shall undertake any construction or development or carry on any activity or use, for which a zoning permit is required by this Chapter, or obtain a building permit for construction, development, activity or use regulated by this Chapter, without first obtaining the required zoning permit."

5. KCC § 8–7.2 (1972) specifies the uses and structures permitted in agriculture districts.

County agencies throughout its public hearings process.

Prior to the August 8 public hearing, the Planning Department prepared a staff report describing the application and providing a preliminary evaluation. The preliminary evaluation stated that while Kauai Springs' existing use is "relatively low impact," the expansion of operations "would intensify the use":

> The existing water bottling facility is relatively low impact ... in its current function and capacity. However, expansion of the facility to include small bottle production at the site would involve increased production machinery, delivery frequency, generate more traffic, and generally would intensify the use, which may not be appropriate or compatible at this location.

At the August 8 hearing, Kauai Springs confirmed that it had been in business for two to three years at that point and the purpose of its application was to "increase ... productivity." Kauai Springs stated that it was currently filling between 300 and 500 five-gallon bottles per week. Kauai Springs requested approval to expand to their maximum capacity of 1,000 five-gallon bottles per day at the existing facility, seven days a week (i.e., 35,000 gallons per week). At maximum capacity, Kauai Springs anticipated "8 total vehicles" making daily round-trips.

Kauai Springs stated that "there is no limit" to how much water can be extracted from the private water system. Kauai Springs also informed the Planning Commission that it planned to produce smaller bottles at its existing facility once it had the capacity to do so. The Planning Commission members discussed whether they should base their decision on the permits upon Kauai Springs' current operations or upon the maximum capacity of the operations.

The Planning Commission also discussed the overflow from the water system. The Planning Department planner stated that it was her understanding that "[t]he overflow from the pipe and from the water tank ... is overflowing into Waihohonu Stream." Commissioner Imai Aiu noted that if Kauai

Springs reached its full potential, "then that is 1,000 gallons a day that is basically taken out of the Waihohonu Stream." In response to an individual who testified that the water "is being wasted" by not being bottled, Commissioner Aiu stated, "So I don't know how much currently flows through there and how much of an [effect] that would have but ... it's not a waste when it's going through an actual river and riparian environment. That is a natural system that does deserve to be looked at."

The Trustee of the Knudsen Trust appeared at the August 8 meeting, in support of Kauai Springs' application. The trustee confirmed that the private water system was owned by Knudsen Trust, and the trust had a signed licensing agreement for Kauai Springs to take the water. The trustee did not think that the licensing agreement was received by the Water Commission.

The August 8 meeting was continued to September 26 to request clarification from the State Land Use Commission regarding the size of the land area under consideration for a Special Permit, and receive clarification from the Department of Land and Natural Resources Commission on Water Resource Management (Water Commission) regarding whether "the proposed quantity of water to be captured and bottled by the operation is of concern to them." Kauai Springs was also asked "to define what it wanted more clearly." Additionally, the Planning Department noted that "[a] question also arose as to whether the Public Utilities Commission (PUC) ... had any jurisdiction over the water system or the sale of water to the Applicant."

In a letter dated September 26, 2006, the Water Commission responded to the Planning Department's request for input on the application. The Water Commission commented that "[t]here may be the potential for ground or surface water degradation/contamination," and therefore "recommend[ed] that approvals for this project be conditioned upon a review by the State Department of Health and the developer's acceptance of any resulting requirements related to water quality."[6] The Water Commission further com-

---

6. The State Department of Health (DOH) offered several "environmental health concerns" for the Planning Commission to consider, regarding: 1) sanitary facilities and disposal of wastewater; 2)

mented that "[g]round-water withdrawals from this project may affect streamflows, which may require an instream flow standard amendment." Finally, the Water Commission stated that although a water use permit was not required because the island of Kaua'i was not a designated ground-water management area, other permits from the Water Commission may be required if the source of Kauai Springs' water was modified:

> The Island of Kauai has not been designated as a groundwater management area; therefore a water use permit from the Commission is not required to use the existing source(s) or to change the type of water use. However, if the source needs to be modified in any way, a well modification permit from the Commission may be required. In addition, if a pump is to be installed to induce additional water flow, a pump installation permit from the Commission would be required. If the source is modified to induce additional water flow, and the modification results in impacts to surface waters, a petition to amend the interim instream flow standard for affected surface waters must be made and approved prior to use of the water.

(Emphases added).

At the September 26, 2006 public hearing, Kauai Springs clarified that it was requesting "approval to fill up to 1,000 5–gallon bottles of water per day, and up to 1,000 cases of bottled water per week at the existing facility." Kauai Springs further clarified that it was requesting ten vans "to be added to our existing facility to accommodate steady growth." The Planning Commission briefly discussed the Water Commission's letter with the applicant, but noted that the Water Commission would be sending additional comments. At the end of the hearing, the Planning Department planner commented that she did not know "whether water is coming out of the tunnel and going into a stream," or "how much water is in the system," although Kauai Springs had "repre-

sented that 275,000 gallons a day are the capabilities of this tunnel."

On October 26, 2006, the Planning Department staff conducted a site visit, accompanied by the applicants, to view the tunnel where the water system originates, the Kahili Mountain Park portion of the water system, the water bottling facility, and the adjacent Grove Farm water tank.[7] The staff described the water system as follows:

> The tunnel entrance is located adjacent to a streambed with steep sides, where it enters the hillside horizontally. To prevent infiltration of surface water into the tunnel, a concrete stem wall was constructed at the bottom of the entrance to above the water level within the tunnel, and a steel panel was mounted over the tunnel entrance. Inside the tunnel, water enters the system through a water pipe installed at or below the water surface. Except for two places where the pipe crosses stream beds on piers, the pipe is buried underground from the tunnel to a water tank on TMK 2–7–01:03. Water is chlorinated at the tank, which serves the Kahili Mountain Park parcel, and feeds the line going to Koloa Town. A second tunnel and a Kuia Stream intake used to join this line in a junction house below the water tank; however, these two water sources have been bypassed due to Department of Health concerns for the influence of surface water. The sole water source is Tunnel #1. Overflow from the system on Kahili Mountain Park is returned to the adjacent stream.

In a letter dated November 6, 2006, the Planning Department requested clarification of the Water Commission's comments in its September 26 letter. The Planning Department summarized its understanding that, providing certain hypothetical conditions applied, no permit was required for Kauai Springs' use of water from the existing water system:

---

the water bottling facility's compliance with applicable ventilating requirements; and 3) air pollution control measures. The DOH concluded that "[d]ue to the general nature of the application submitted," it "reserve[d] the right to implement future environmental health restrictions when more detailed information is provided."

7. The Planning Commission did not attend the site visit. Although the Commission approved a motion for a site visit to the tunnel and bottling facility sometime between October 25 and October 31, 2006, the visit was not scheduled due to Sunshine Law concerns and trail conditions.

II. The tunnel is not being changed, and the Applicant's use of the water is not affecting the source in any way (i.e. not inducing more water to come out of the source or tunnel)

III. The existing source has been registered and is basically grandfathered, and there is an agreement between the new user (Applicant) and the operator of the system.

IV. There is a closed line from the tunnel to the tank.

It was also the Planning Department's understanding that additional permits and a petition to amend the interim instream flow standard for affected surface waters may be required under the circumstances outlined in the Water Commission's letter.

At the November 14, 2006 hearing, counsel for Kauai Springs stated that the application request was to bottle a maximum of 1,000 gallons of water per day, and to use a maximum of two vans a day for the delivery of that water. Counsel agreed that "[t]his would represent an amendment to the previous request of 1,000 five-gallon bottles a day and one thousand cases of water in smaller bottles a week to be delivered in ten ... vans per day and one 40–foot container per day."

A consultant for Grove Farm also appeared at the November 14 hearing. He confirmed that Grove Farm did not own the water tunnel, but managed the water system and sold the water. He stated that Grove Farm was not "involved ... at all" in Kauai Springs' Use Permit request because the request did not involve Grove Farm property. The consultant stated that he had "no clue" if there were any applicable PUC requirements regarding Grove Farm selling the water to Kauai Springs. To his knowledge, Grove Farm had never communicated with the PUC. The Planning Department planner suggested that the PUC does not "grandfather at all so they just probably didn't know about [the Grove Farm system]. It wasn't something that came to anybody's attention because it was so small a system."

By letter dated November 20, 2006, the Water Commission responded to the Planning Department's request for clarification. The Water Commission stated, "We concur with your summary of our comments and confirm that no permits from the Commission are required for the proposed use of water under the three conditions outlined in your letter."

By letter dated November 22, 2006, the PUC responded to the Planning Department's November 6 inquiry "as to whether Grove Farm's water system and Kauai Springs, Inc.'s sale of water from the Grove Farm water system are regulated by the [PUC]." The PUC responded that based on "the limited information provided, there is a possibility that Grove Farm may be operating as a public utility[.]"[8] However, the PUC stated that an analysis of whether Grove Farm was operating as a public utility would include determining whether Grove Farm provides water service for the public's use and the amount of control its customers may exert over the water system. Accordingly, "[a]dditional information, including a review of all relevant facts and possibly testimony from all concerned parties, would be necessary before a determination could be made[.]" With respect to Kauai Springs, the PUC stated that "it does not appear that Kauai Springs would be a public utility subject to commission jurisdiction." The PUC explained:

Such operations may not rise to services of such a public character and of public consequence and concern that is to be regulated under HRS Chapter 269, as bottled water may be obtained from a number of competing sources and providers. The commission does not currently exercise jurisdiction over any water bottling facilities in the State.

The PUC cautioned that its letter constituted an "informal opinion" based on the information provided and was not binding on the PUC. The PUC concluded, "If you require a formal opinion on this matter, you may file a

---

8. A "public utility" is defined as "every person who may own, control, operate, or manage as owner, lessee, trustee, receiver, or otherwise, whether under a franchise, charter, license, articles of association, or otherwise, any plant or equipment, of any part thereof, directly or indirectly for public use ... for the production, conveyance, transmission, delivery, or furnishing of ... water[.]" HRS § 269–1 (Supp.2012).

petition for declaratory relief pursuant to chapter 6–61, subchapter 16, Hawaii Administrative Rules."

At the November 28, 2006 public hearing, the Planning Commission discussed granting conditional permits, provided that Kauai Springs would agree to furnish status reports that would allow the Commission to monitor progress. Specifically in regard to the Use Permit, counsel for Kauai Springs informed the Planning Commission that Kauai Springs would be willing to accept restrictions on the permit, such that the permit would be exclusively for the use of Kauai Springs, it would not be transferable, and the Commission would have the right to review the permit if Kauai Springs sold its business.

The Planning Commission also discussed postponing its decision pending a declaratory ruling by the PUC or Water Commission, or conditioning approval of the permits on a declaratory ruling. However, the Planning Commission stated that it was required to act on the Special Permit by January 31, 2007 and that the rules of the Commission did not allow for an extension of time. The Commission members thus voted to close the public hearing.

By letter dated November 28, 2006, counsel for Kauai Springs wrote to the Planning Commission to "confirm, in writing, the Applicant's request." Counsel wrote, "In order to be capable of further growth, the Applicant, after careful consideration of the evidence presented at the public hearings and notwithstanding the testimony provided by myself to the contrary, has decided to maintain the request for approval as set forth in his original application." This request was for a maximum of 1,000 five-gallon bottles per day (or 5,000 gallons per day or 35,000 gallons per week), a maximum of ten van round-trips per day, a maximum of one 40-foot container round-trip per week, and a maximum of five employees at any one time. Counsel wrote that he regretted any confusion caused by his testimony at the November 14 hearing and "look[ed] forward to coming to agreeable terms that are acceptable to all parties involved."

In a letter dated November 30, 2006, the Office of Hawaiian Affairs (OHA) wrote that it was concerned with Kauai Springs' application "because it involves the use of an important public trust resource—fresh water—for personal financial gain," and it "appear[ed] to be the first attempt to bottle and sell Hawaii's surface water[.]" OHA stated that the Planning Commission had acted pursuant to its public trust duty "by requesting clarification on public trust issues from [the Water Commission] and the [PUC]." OHA wrote that it was not enough to require Kauai Springs to request a declaratory ruling from the Water Commission. Rather, the Water Commission should investigate whether "Hawai'i water law is already being violated." "For example, the off-stream flows may have already increased with Kauai Springs' use of the water, or there may be transport of water outside the watershed of origin." OHA requested that the Commission require these studies to be conducted prior to issuing any permits. OHA further requested that the Planning Commission resolve the "outstanding PUC issues" regarding whether Grove Farm and Kauai Springs were operating as public utilities. Given the January 27, 2007 deadline for a decision on the application, OHA argued that the Commission "uphold its public trust responsibilities by denying Kauai Springs' permit applications without prejudice, until the applicant can show, and the appropriate agencies can concur, that Kauai Springs' proposed use is reasonable-beneficial and will not interfere with public trust purposes." At a minimum, OHA contended that Kauai Springs should be required to obtain a declaratory ruling from the Water Commission "regarding the need for an instream flow standard amendment and a final decision from the PUC regarding the need to register as a public utility."

By letter dated December 1, 2006, counsel for Kauai Springs wrote to the Planning Commission, suggesting specific language regarding the "non-transferability" condition to the Use Permit that had been discussed at the prior public hearing.

At the January 23, 2007 regular meeting of the Planning Commission, the Commission considered the recommendation to deny the permits made by Planning Department planner Bryan Mamaclay, who had recently replaced the prior planner. Counsel for Kauai

Springs stated that he "was really surprised" when he received Mr. Mamaclay's staff report recommending that the permits be denied. Counsel believed that Mr. Mamaclay "was put in a difficult position by inheriting this file at the last minute." Counsel explained that based on his last conversation with Mr. Mamaclay, his impression had been that Mr. Mamaclay "would like to have some more time to look at it but because of the rules we weren't afforded that opportunity. So instead of working with conditions . . . as you are enabled to do he chose to take the denial route."

Mr. Mamaclay explained that the comments received from the Water Commission, PUC, and OHA were "an issue because . . . we need some comfort level or some certainty that the applicant has the right or the authority to extract and draw the water on a commercial basis." Mr. Mamaclay noted that the Water Commission's letter included "caveats or some qualifying statements," which raised the question of whether Kauai Springs had gone "through a process to ensure that there is no violation of any [Water Commission] rules." Mr. Mamaclay further informed the Commission that the "absolute deadline" for the Special Permit was January 31, 2007.

After further discussion and public testimony, the Planning Commission voted 6–1 to deny the three permits. That same day, January 23, 2007, the Commission issued its Findings of Fact, Conclusions of Law, Decision and Order (Decision and Order) denying the application.

With respect to time constraints for acting on the application, the Planning Commission found that "[t]he absolute deadline for action on the application based on procedures for action on Special Permits is 210 days after the acceptance of the application or January 31, 2007." The Planning Commission found that "[t]he delay in reaching a decision . . . was attributed to staff's effort in obtaining additional information relating to the Applicant's authority and right to obtain and extract the water for commercial purposes."

The Planning Commission summarized the findings and comments submitted by the Water Commission and the PUC. In relation to the Water Commission's input, the Planning Commission found the Water Commission had qualified its comments by stating that permits may be required if certain modifications were made:

b. The Planning Department further acknowledges the qualifying remarks by [the Water Commission] that:

I. if the source needs to be modified in any way, a well modification permit from [the Water Commission] may be required;

II. if a pump is to be installed to induce additional water flow, a pump installation permit from [the Water Commission] would be required;

III. if the modification results in impacts to surface waters, a petition to amend the interim instream flow standard for affected surface waters must be made and approved prior to use of the water.

Relative to these comments, the Planning Commission found that the Planning Department's site visit to the tunnel where the private water line is located confirmed that a "concrete stem wall" and "steel panel" had been constructed at the tunnel entrance:

c. Relative to the foregoing, it is also acknowledged as confirmed during a site visit to Tunnel # 1, that to prevent infiltration of surface water into the tunnel, <u>a concrete stem wall was constructed at the bottom of the tunnel entrance to above water level within the tunnel and a steel panel was mounted over the tunnel entrance.</u> Furthermore and as noted by the staff, inside the tunnel, water enters the system through a water pipe installed at or below the water surface. Thereafter, the water line is buried up to a water tank . . . where it is chlorinated before servicing Kahili Mountain Park and the 11 homes in Koloa Town.

(Emphasis added).

In relation to the PUC's comments, the Planning Commission found that "Kauai Springs would not be a public utility subject to commission jurisdiction since the commission does not currently exercise jurisdiction over any water bottling facility in the State." However, the Commission found that the "PUC further draws interest in its findings relating to Grove Farm as the seller of the water from its system to the Applicant and

its status with the PUC." The Commission found in this regard that the PUC's letter stated "there is a possibility that Grove Farm may be operating as a public utility," and that the PUC qualified its response as an "informal opinion based on the limited information provided[.]" (Quotation marks omitted).

In light of the observations made during the site visit and the comments made by the PUC and the Water Commission, the Planning Commission found "there may be outstanding regulatory processes" that Kauai Springs must satisfy:

In view of the foregoing, there may be outstanding regulatory processes with [the Water Commission] that the Applicant must satisfy. Based on the comments provided by [the Water Commission] and staff observations during the field trip, it should be the Applicant's responsibility to confirm and determine the need for any permits that may be required for the construction of the concrete stem wall and the steel panel mounted over the tunnel entrance. The permit requirements administered by [the Water Commission] are cited in HRS Section 174C–71(3)(A), (Protection of Instream Uses) . . . and requires persons to obtain a permit from the Commission prior to undertaking stream channel alteration provided that routine streambed and drainage way maintenance activities and maintenance of existing facilities are exempt from obtaining a permit.

Comments received from the PUC also draws interest to the extent that as a purchaser of the water from Grove Farm, the operation may be subject to PUC regulation. The PUC in this regard encourages that a declaratory ruling be sought to allow more diligent review of the relevant facts and information associated with the proposed water bottling facility.

As evidenced by additional testimony provided by [OHA] and concerned parties, the Planning Commission is being requested to exercise caution and deny the Applicant's request in its role as decision maker in the land use permit process.

(Emphases added).

Based on the above findings, the Planning Commission concluded that Kauai Springs had failed to carry its burden of demonstrating that its proposed use did not violate all applicable requirements and regulatory processes relating to water rights, and that there was no substantive evidence that Kauai Springs had legal standing and authority for its proposed water use:

3. In view of the comments received from [the Water Commission] and PUC the land use permit process should insure that all applicable requirements and regulatory processes relating to water rights, usage, and sale are satisfactorily complied with prior to taking action on the subject permits. The Applicant, as a party to this proceeding should also carry the burden of proof that the proposed use and sale of the water does not violate any applicable law administered by [the Water Commission], the PUC or any other applicable regulatory agency.

4. There is no substantive evidence that the Applicant has any legal standing and authority to extract and sell the water on a commercial basis.

(Emphases added).

At the Planning Commission's February 13, 2007 regular meeting, the Commission considered Kauai Springs' request for reconsideration of the Decision and Order. At the hearing, counsel for Kauai Springs argued that the purpose of the motion for reconsideration was "to prevent hasty or ill advised action." Counsel stated that "after four months of lengthy public hearings the new planning staff person received the file just days before the purported deadline that we were told a decision had to be made[,] which was the 210 day deadline [for the Special Permit]." Counsel argued that it was a mistake for the Commission to deny the permits based on issues raised in OHA's letter, where OHA erroneously stated that the application involved a surface water system, and where every other administrative agency had "responded favorably to the applicant." Counsel requested that the Commission "vote to reconsider and then continue this matter to a time in the not to[o] distant future when we can all get our arms around any of the remaining issues including any issues raised by that OHA letter that came in just days before [the staff] report and that we can make a fully reasoned decision."

In response to counsel's comments, Commissioner Randall Nishimura questioned whether granting reconsideration would place the Commission in violation of the "210 day requirement for the Special Permit." The County Attorney responded that it was his impression that the Commission could not grant an extension of the deadline even if Kauai Springs requested it. Counsel for Kauai Springs stated that he had discussed this issue with a County Attorney and the Mayor, and it was his understanding that Kauai Springs could waive the 210 day requirement. The County Attorney informed the Commission that the Decision and Order had been issued on the 203rd day following acceptance of the application, which would leave the Commission with seven days to act upon reconsideration.

After further discussion, counsel for Kauai Springs stated that "[t]he applicant would certainly be willing to waive something to avoid a hasty decision[.]" Counsel continued:

> I think we would have asked for that two weeks ago in my discussions with the planner had we known that we could and that was why I was somewhat heartened after our meeting a week and a half ago with the Mayor. But absolutely we would be willing to execute a document, <u>I'm happy to work with the County Attorney, a waiver of our rights.</u> We are not trying to have you open it today and then argue that that's an automatic approval we want to get this right. We believe there are important issues to be resolved. We are not trying to sneak anything by here.

(Emphasis added).

Following public oral testimony on the request for reconsideration, a formal motion to reconsider the Decision and Order was made. Several Commissioners stated that they could not support the motion due to their belief that the Commission was not in a

position to resolve the "water rights issue." The Planning Commission voted 4–1 to deny the motion for reconsideration.

In a letter dated February 15, 2007, the Planning Department confirmed the Commission's vote to deny the motion for reconsideration and notified Kauai Springs that continued operation on the Property constituted a land use violation. On March 13, 2007, the Planning Department ordered Kauai Springs to shut down its operations on the Property. The Planning Department's Notice of Violation dated March 13, 2007 provided that the department inspected the Property on March 8, 2007, and found violations of the Kauai CZO based on the continued operation of the water bottling facility without the required permits. Kauai Springs was ordered to correct the violation(s) within fifteen days and to cease and desist the illegal activities.

## II. Circuit Court Proceedings

On March 15, 2007, Kauai Springs appealed the Decision and Order to the circuit court. On May 15, 2007, the circuit court granted Kauai Springs' motion for a preliminary injunction and enjoined the Planning Department from enforcing the Decision and Order.

On September 17, 2008, the circuit court issued its order, reversing in part and vacating in part the Planning Commission's Decision and Order.

The circuit court concluded that pursuant to HRS § 91–13.5 (Supp.2006) and the relevant county code provisions, and based upon the Planning Commission's acceptance of Kauai Springs' application on July 5, 2006, the Commission was required to act upon the three requested permits by the following dates: 1) October 18, 2006 for the Use Permit; 2) November 2, 2006 for the Class IV Zoning Permit; and 3) January 31, 2007 for the Special Permit.[9] The circuit court con-

---

9. For use permits, the Planning Director is required to either make a decision on the permit or refer the permit application to the Planning Commission within forty-five (45) days. KCC § 18–9.5(d). *See* KCC § 8–20.6(a) (providing that use permit procedures are governed by KCC § 18–9.5, which describes the procedures for a Class III zoning permit). If the application is referred to the Planning Commission, the Planning Commission is required to act on the appli-

cation within sixty (60) days. KCC § 18–9.5(f). Thus the Planning Commission had a total of 105 days from July 5, 2006 to act upon the Use Permit, unless there was assent to an extension of the deadline.

For Class IV zoning permits, the Planning Director is required to prepare a report on the application within sixty (60) days. KCC § 18–9.6(c). Within sixty (60) days of receiving the

cluded that the Planning Commission's failure to act within the time frame for the Use and Class IV Zoning permits meant that "Kauai Springs had a legitimate claim of entitlement" to those permits and those permits were "deemed approved" as of the date of the deadlines.

The circuit court further concluded that Kauai Springs did not waive the deadlines or assent to extensions by appearing and participating in subsequent public hearings or by not demanding that its application be approved. The circuit court concluded that "[i]t was reasonable for Kauai Springs to await the Planning Commission's decision," and "[ t] he failure to adhere to the time requirements was due solely to the actions of the Planning Commission."

In regard to the criteria applied by the Planning Commission in denying the permits, the circuit court concluded that the Planning Commission did not consider the proper criteria, although the "applicable standards" for the three permits were "clearly established."

Regarding the Use Permit, the circuit court concluded that the Kauai CZO provides that the purpose of the permit, to assure proper integration into the community of uses, was satisfied by Kauai Springs' proposed use:

42. The Kauai Zoning Code provides "the purpose of the 'use permit' is to assure the proper integration into the community of uses which may be suitable only in specific locations in a district . . . and to prohibit such uses if the proper integration cannot be assured."

43. Kauai Springs is properly integrated into the community of uses. It had been operating without issue and with all the state and county permits necessary including two County building permits. The Planning Department staffer remarked about Kauai Springs, "[t]he existing water bottling facility is relatively low impact at the subject location in its current function and capacity."

44. The Planning Department staffer also stated that the watershed on the Property looked "just like any other Ag. Building."

45. There is nothing in the Decision and Order or the Record to indicate that Kauai Springs' existing or proposed uses were not or will not be integrated.

(Citations omitted) (emphases added). The circuit court further concluded that KCC § 8–20.5 "sets forth the standards the Planning Commission should have applied when considering Kauai Springs' application for a Use Permit." The circuit court concluded that the Decision and Order did not state, and the record did not indicate, that Kauai Springs did not meet these standards.

In regard to the standards for the Special Permit, the circuit court similarly concluded that HRS § 205–6, county ordinances, and the Planning Commission Rules set forth the proper standard for issuing the permit and there was no indication in the Decision and Order or the record that Kauai Springs failed to meet these criteria. The circuit court reached a similar conclusion for the Class IV Zoning Permit.

The circuit court then addressed the Planning Commission's duties under the public trust. The circuit court first concluded that the County has duties under the public trust:

61. The State of Hawaii and its political subdivisions have duties under the public trust. Haw. Const. art. IX; *Kelly v. 1250 Oceanside Partners*, 111 Hawai'i 205, 140 P.3d 985 (2006).

62. "Political subdivisions" of the State include the County of Kauai. *Kelly v. 1250 Oceanside Partners*, 111 Hawai'i 205, 140 P.3d 985 (2006).

(Emphases added). The circuit court then concluded that the record was devoid of any evidence that Kauai Springs' proposed or

report, the Planning Commission is required to hold at least one public hearing on the application and to make a determination on the application. KCC § 18–9.6(d). Thus the Planning Commission had a total of 120 days from July 5, 2006 to act upon the Class IV Zoning Permit, absent assent to an extension.

Special Permits are governed by Chapter 13 of the Rules of Practice and Procedures of the Planning Commission (Planning Commission Rules).

Section 13–7(a) provides that the Commission must vote on a Special Permit application no later than 210 days after the acceptance of the application, "or within a longer period as may be agreed by the applicant to the extent permitted by law." For purposes of HRS § 91–13.5, if the Commission fails to vote on the petition within the established time frame, the petition is deemed approved after an additional thirty (30) days. § 13–8(a)(2).

existing use would affect public trust resources, and nothing to indicate that the Planning Commission did not fulfill its public trust duties:

63. Decisions on permit applications must be grounded in fact and the Record, not speculation, and the Record in this case is devoid of any evidence that Kauai Springs['] existing or proposed uses might affect water resources subject to the public trust.

64. In the Decision and Order, the Planning Commission concluded that Kauai Springs' applications could be denied because Kauai Springs should have pursued "outstanding regulatory processes." The only regulatory process asserted by the Planning Commission as being outstanding was that Kauai Springs had not "proactively sought a declaratory ruling" from either the Water Commission or the PUC.

With respect to the Water Commission and the PUC's input, the circuit court found that those agencies informed the Planning Commission that Kauai Springs was not within their "jurisdictions, interests, or concerns," and the Water Commission stated that no permits were required because of the circumstances of Kauai Springs' water use:

53. The Decision and Order stated the Planning Commission had sought and received the input of the ... Water Commission and the PUC, both of which informed the Planning Commission that Kauai Springs was not within their respective jurisdictions, interests, or concerns.

. . . .

RA at 344 (FOF # 18).

54. The Decision and Order stated the Water Commission informed the Planning Commission that Kauai Springs required "no permits" because "the Applicant's use of the water is not affecting the source in any way (i.e., not inducing more water to come out of the source or tunnel)," "the existing source has been registered and is basically grandfathered, and there is an agreement between the new user (Applicant) and the operator of the system," and "there is a closed line from the tunnel to the tank." RA at 344 (FOF # 19.a.).

The circuit court concluded that the Water Commission and PUC disclaimed interest in the application, state law did not require "pursuit of futile administrative processes," and the Commission had not identified "any other outstanding regulatory processes" required to be fulfilled by Kauai Springs:

65. The Water Commission and the PUC are authorized pursuant to Haw.Rev.Stat. ch. 269 and ch. 174C respectively to regulate water allocations and public utilities. Both agencies informed the Planning Commission that Kauai Springs' uses were of no significant interest to them.

. . . .

70. Hawaii law does not require pursuit of futile administrative processes.

71. The Planning Commission did not identify any other outstanding regulatory processes that it claimed must have been fulfilled in order to satisfy any duty under the public trust that it may have had.

(Citations omitted). Accordingly, the circuit court concluded that there was "nothing in the Record ... to show that the Planning Commission did not fulfill any duty it may have under the public trust."

Finally, the circuit court concluded that Kauai Springs carried its burden of showing that its proposed use did not violate any applicable law administered by any applicable regulatory agencies:

73. If Kauai Springs bore the burden of proof that its proposed use did "not violate any applicable law administered by [the Water Commission], the PUC or any other applicable regulatory agency," Kauai Springs plainly carried that burden of proof. Both of these agencies had provided their input to the Planning Commission, and neither agency had any substantial concerns with Kauai Springs, as reflected in the Decision and Order.

74. There was no evidence presented at the public hearings, and no findings made by the Planning Commission that Kauai Springs did not carry any of its burdens to show it was entitled to the three permits at issue in this appeal, and the Planning Commission was clearly erroneous when it determined that Kauai Springs did not meet the burden on the zoning permit applications.

(Citations omitted) (emphases added).

The circuit court concluded that the Decision and Order "purport[ed] to shift a burden

to Kauai Springs to disprove future events," and therefore the Decision and Order was arbitrary or capricious. The circuit court further concluded that "[t]he Decision and Order is in violation of statutory provisions, in excess of the statutory authority or jurisdiction of the Planning Commission, made upon unlawful procedure, affected by other error of law, clearly erroneous, and arbitrary or capricious."

Based on the above, the circuit court reversed the Decision and Order with regard to the Use Permit and the Zoning Permit. The circuit court ruled that Kauai Springs' application for those permits was approved and "shall be issued by the appropriate agency or department." The circuit court vacated the Decision and Order with regard to the Special Permit and remanded the case to the Planning Commission "with an order to issue the Special Permit to Kauai Springs immediately."

The circuit court further ruled that the Decision and Order "exceeds the Planning Commission's authority or jurisdiction, is clearly erroneous in view of the reliable, probative and substantial evidence on the whole record; and is arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion." The circuit court permanently enjoined the Planning Commission from enforcing the Decision and Order.

The circuit court's final judgment in favor of Kauai Springs and against the Planning Commission was entered on September 23, 2008. On October 22, 2008, the Planning Commission timely appealed to the ICA.

### III. ICA Appeal

#### A.

On appeal to the ICA, the Planning Commission raised four points of error:

a. Whether the circuit court was correct that the Use Permit and the Class IV Zoning Permit were automatically approved pursuant to provisions in the KCC.
b. Whether the Planning Commission had public trust obligations to review Kauai Springs' use of water.
c. If the Planning Commission had public trust obligations to review Kauai Springs' use of water, whether the Planning Commission applied the proper standards and criteria in reviewing the application for the permits.
d. Whether the circuit court was correct that Kauai Springs met its burden of proof to be entitled to the permits.

*Kauai Springs, Inc. v. Planning Comm'n of the Cnty. of Kauai,* 130 Hawai'i 407, 410, 312 P.3d 283, 286 (App.2013).

First, with respect to the automatic approval deadlines for the Use and Class IV Zoning permits, the Planning Commission argued that the circuit court erred in concluding that Kauai Springs did not assent to extending the deadlines and that the failure to adhere to the time requirements was due solely to the actions of the Planning Commission. The Commission argued that the CZO plainly permits applicants to "assent" to a delay in the approval process for Use and Class IV Zoning permits. (Citing KCC §§ 8–19.5(g) and 8–19.6). The Planning Commission noted that the deadline for the Use and Class IV Zoning permits had expired on October 18 and November 2, 2006, respectively. However, during the five public meetings held between August 8, 2006 and February 13, 2007, Kauai Springs and its counsel "were fully engaged in deliberations and negotiations" and did not assert that the deadlines were set to expire or had expired. The Planning Commission thus contended that "[b]y its conduct, [Kauai Springs] led the Planning Commission to reasonably believe that [Kauai Springs] assented to a delay in the final decision" on the Use and Class IV Zoning permits. The Planning Commission argued that the ICA should reverse the circuit court's order deeming the Use and Class IV Zoning permits to have been automatically approved.[10]

10. Malama Kaua'i and Hawaii's Thousand Friends (MKHTF) filed a brief of amici curiae in the proceedings before the ICA. MKHTF agreed with the Planning Commission that Kauai Springs assented to an extension of the time period for consideration of the Use and Class IV Zoning permits. Additionally, MKHTF argued that "deeming Kauai Springs' applications 'automatically approved,' where [the Planning Com-

Second, the Planning Commission argued that the circuit court erred in implicitly holding that the Planning Commission had no duty under the public trust doctrine to consider the implications of the proposed water use on public trust resources.[11] The Planning Commission argued that based on article 11, section 7 of the Hawai'i Constitution and applicable law, the circuit court should have concluded that the Planning Commission, as a political subdivision, had a duty to examine the legality of Kauai Springs' water use, regardless of whether the Water Commission asserted jurisdiction over the matter.

The Planning Commission also challenged the circuit court's COL ¶ 63, concluding that the record was "devoid of any evidence that Kauai Springs existing or proposed use might affect water resources subject to the public trust." The Planning Commission argued that the public trust doctrine applies to *all* water resources. Thus, although the Knudsen Trust owns the land containing the water source and Grove Farm owns the water system, the Planning Commission was obligated to examine Kauai Springs' use of water, and Kauai Springs was required to show that its use was "legal." Given that Kauai Springs "sought after-the-fact permits to greatly increase its industrial bottling and commercialization of drinking water taken from a ground-water source," the Planning Commission argued that "the record contained ample evidence demonstrating that [Kauai Springs'] existing or proposed use might affect resources subject to the public trust."

Third, the Planning Commission argued that the circuit court erred in concluding that the Planning Commission did not consider the proper criteria when reviewing and processing Kauai Springs' application. The Planning Commission contended that implicit in the circuit court's conclusion was the assumption that Kauai Springs was only bound by the specific permit requirements and "was not required [under the public trust doctrine] to prove the legality of its commercialization of fresh-water resources[.]" The Planning Commission argued that Kauai Springs had the burden of justifying its proposed uses in light of the public trust doctrine and the higher level of scrutiny imposed for private commercial uses of public resources. Thus, the Planning Commission did not act arbitrarily or capriciously by scrutinizing Kauai Springs' water use and denying the three permits based on the issue of water rights.

Finally, the Planning Commission argued that the circuit court erred in concluding that assuming Kauai Springs bore the burden of proof in showing that its proposed use did "not violate any applicable law" administered by the Water Commission, the PUC or any other applicable regulatory agency, Kauai Springs "plainly carried that burden of proof." According to the Planning Commission, Kauai Springs "was required to present concrete evidence that it possessed a legal right to bottle and sell water taken from the cave owned by Knudsen Trust, and that the proposed use was not inimical to the purposes of the public trust." Kauai Springs failed to present such evidence, offering "only conclusory assertions regarding the impact of [its] proposed increase in water use on the interests of other users, the general public, and the environment," and offering insufficient information as to its relationship with Grove Farm and Knudsen Trust. The Planning Commission focused on the "equivocal responses" from the Water Commission and the PUC and argued that it was erroneous for the circuit court to conclude that "neither agency had any substantial concerns."

Relatedly, the Planning Commission argued that the circuit court erred in concluding that Kauai Springs met the relevant

---

mission] specifically and diligently sought to fulfill its trust duties with Kauai Springs' assent, would wrongly penalize [the Planning Commission] and the public trust and nullify [the Planning Commission's] duties and Kauai Springs' burden of proof and, therefore, run afoul of the constitution."

**11.** The Planning Commission specifically challenged the circuit court's COL ¶ 71 ("The Plan-

ning Commission did not identify any other outstanding regulatory processes that it claimed must have been fulfilled in order to satisfy any duty under the public trust that it may have had") and COL ¶ 72 ("There is nothing in the Record ... to show that the Planning Commission did not fulfill any duty it may have under the public trust") based on the use of the word "may" to describe the Planning Commission's public trust duties.

permit criteria. Specifically, the Planning Commission argued that the circuit court erred by concluding that Kauai Springs' existing or proposed uses "were not or will not be integrated" into the community of uses, given that: 1) the applicable law required Kauai Springs to present evidence that its existing and proposed uses *were* integrated into the community of uses; and 2) Kauai Springs' "burden to demonstrate the integration of its proposed land-use was not mutually exclusive from its burden to demonstrate the legality of its proposed water-use." The Planning Commission contended that Kauai Springs failed to present "substantive evidence concerning either water rights or possible impacts that the proposed increase in water usage would have on the ground-water source or neighboring users' access to the water." Thus, Kauai Springs did not satisfy the applicable permit criteria.[12]

### B.

Kauai Springs first responded that the County ordinances and rules permitting a permit applicant to assent to an extension were invalid because they exceeded the scope of their enabling statute, HRS § 91–13.5. HRS § 91–13.5 provides that agencies shall adopt rules specifying maximum time periods for acting on certain permits, and that any application not decided within the established time frame is "deemed approved." Kauai Springs emphasized that HRS § 91–13.5(e) provides for only three circumstances under which the designated time periods may be extended, for national disasters, state emergencies, or union strikes preventing the fulfillment of application or review requirements. Kauai Springs argued that the statute does not include the applicant's "assent" as a reason for extending deadline, which demonstrates that "assent"

was intended to be excluded from the statute's scope. Thus, Kauai Springs argued that the County ordinances and rules permitting an applicant to "assent" to an extension were in conflict with superior state law and therefore invalid.

Even assuming that an applicant is permitted to assent to an extension, Kauai Springs argued that the circuit court correctly found that Kauai Springs did not assent to an extension by appearing at the public hearings after the deadlines had passed. Kauai Springs contended that merely appearing at the hearings did not constitute waiver or affirmation, and that in this case, it did not waive the deadlines by any affirmative conduct such as asking for extra time or withdrawing its application.

Second, Kauai Springs argued that the circuit court recognized the Planning Commission's public trust duties and held that the Planning Commission satisfied those duties. Kauai Springs further argued that it did not seek approval for a "use of water" because the application did not seek the Planning Commission's permission to take or extract water, as Kauai Springs does not control the source of the water or the transmission system. Rather, Kauai Springs sought only to tap into a "pipeline that crosses its property," similar to "any person or business statewide that purchases water from someone else, or fills a bottle with a garden hose." "Thus, the Planning Commission's public trust inquiry was limited to whether public resources would be impacted by Kauai Springs' building on agriculturally-zoned land."

Kauai Springs argued that the Planning Commission's public trust duties did not entitle it to "turn the usual zoning process into an open-ended and standardless inquiry . . .

---

12. OHA filed an amicus curiae brief in which it argued that the circuit court erred in concluding that the record was devoid of any evidence that Kauai Springs' proposed or existing uses might affect public trust resources. OHA argued that the "bottling and sale of water is inconsistent with protecting" the water resource "in its natural state," and that "it was necessary for the Planning Commission to evaluate these two competing uses of water." OHA also challenged the circuit court's COL ¶ 72 as improperly stating that the Planning Commission had no duty to

address the impact of Kauai Springs' operation on the public trust resource. OHA contended that because the Water Commission and PUC stated that they did not have direct jurisdiction over the operation, the duty to protect the public trust resources fell to the Planning Commission, which properly denied the permits "when it became clear that Applicant Kauai Springs had not met its burden of addressing the public trust values incorporated into Hawaii's Constitution and in the State Water Code."

merely because a connection can be made between a permit application and water resources." Kauai Springs claimed that in this case, the Planning Commission took reasonable measures and made appropriate assessments to assess the impact of Kauai Springs' use on public trust resources, and possessed affirmative evidence, based on input from the other county agencies, that the use would have no impact on such resources.

Kauai Springs argued that the Planning Commission sought to have Kauai Springs pursue "outstanding regulatory processes," without identifying the required "processes." Kauai Springs notes that as the circuit court determined, "[t]he only regulatory process asserted by the Planning Commission as being outstanding was that Kauai Springs had not 'proactively sought a declaratory ruling' from either the Water Commission or the PUC." However, those agencies "had already expressly informed the Planning Commission they had no interest in Kauai Springs," and the "Planning Commission has never revealed what ... declaratory rulings ... would accomplish." Kauai Springs concluded that "[t]he public trust doctrine does not empower an agency to deny an application for zoning permits simply because the agency asserts it lacks information."

### C.

The ICA vacated the circuit court's judgment and remanded the case to the Planning Commission for further proceedings to consider whether Kauai Springs satisfied the specific criteria for the requested permits, in light of the public trust doctrine.

On the first issue of the "deemed approved" deadlines, the ICA found it uncontested that the deadlines for the Planning Commission to act on the Use and Class IV Zoning permits were October 18 and November 2, 2006, respectively, and that the Decision and Order was not issued until January 23, 2007. *Kauai Springs,* 130 Hawai'i at 418, 312 P.3d at 294. However, the ICA recognized that the applicable ordinances provide that permits shall be deemed approved if the Planning Commission fails to take action within the prescribed time limits, "unless the applicant assents to a delay." *Id.* (emphasis in original) (quoting KCC §§ 8–19.5(g), 18–9.6(e)).

The ICA rejected Kauai Springs' argument that the County ordinances are in conflict with HRS § 91–13.5(e) because "assent" is not one of the three enumerated circumstances for extending agency deadlines. *Id.* Examining the legislative history of HRS § 91–13.5, the ICA found that the legislature "contemplated flexibility in rule-making and a balance between streamlining on one hand and constitutional demands, public input, and environmental concerns on the other hand[.]" *Id.* The ICA thus held that the "challenged assent provisions do not conflict with HRS § 91–13.5." *Id.* (citations omitted).

The ICA then held that Kauai Springs assented to an extension of the deadlines for the Use and Class IV Zoning permits based on the following conduct by Kauai Springs and its counsel: 1) on November 14, 2006, amending the original application to seek approval for only its current needs; 2) on November 28, 2006, retracting its earlier amendment and asking the Planning Commission to consider its original application for approval of future needs, and continuing to negotiate for the granting of a conditional Use Permit; 3) on January 23, 2007, contending that the Planning Commission should grant all three permits; and 4) on February 13, 2007, requesting reconsideration of the Decision and Order, offering to accept conditional permits, and requesting a continuance to obtain more evidence pertaining to the issue of water rights. *Id.* at 419–20, 312 P.3d at 295–96. The ICA reasoned that "[a]t no point in time did Kauai Springs assert that its permit application had been automatically approved." *Id.* at 421, 312 P.3d at 297.

Accordingly, the ICA held that the circuit court erred in concluding that Kauai Springs did not assent to an extension of the deadlines for the Use and Class IV Zoning permits. *Id.*

Second, in regard to the Planning Commission's public trust obligations to review Kauai Springs' use of water, the ICA found the circuit court's conclusions "somewhat conflicting" as to the *scope* of the Planning Commission's public trust duties, given that COL ¶ 63 provided that the record "is devoid of any evidence that Kauai Springs existing or proposed uses might affect water resources

subject to the public trust," and COLs ¶¶ 71 and 72 suggested that the Planning Commission "may" have public trust duties. *Id.* at 422–23, 312 P.3d at 298–99. The ICA therefore held that COLs ¶¶ 63, 71 and 72 were "incorrect in that they do not recognize the Planning Commission's public trust duty to consider and review Kauai Springs' water usage in its water bottling operation." *Id.* (emphasis added).

The public trust duty to protect ocean waters is based on a "combined analysis of article XI, section I and the 'general laws' that delegated duties and responsibilities to the county." *Id.* at 423, 312 P.3d at 299 (citing *Kelly v. 1250 Oceanside Partners*, 111 Hawai'i 205, 224–25, 140 P.3d 985, 1004–05 (2006)). The ICA concluded that the County's public trust duty and the general laws conferring zoning power to the County established that the Planning Commission "had a duty to conserve and protect water in considering whether to issue the Use Permit and the Class IV Zoning Permit[.]" *Id.* at 425–426, 312 P.3d at 301–02.

The ICA then found that Kauai Springs' current and proposed use of the Property "directly affects a public trust resource." *Id.* at 427, 312 P.3d at 303. Thus, the ICA vacated the circuit court's COLs ¶¶ 63, 71 and 72 and rejected Kauai Springs' claim that the Planning Commission's public trust inquiry was limited to whether public resources would be affected by Kauai Springs' building on the land. *Id.*

Third, the ICA considered whether the Planning Commission applied "the correct standards and criteria in carrying out its public trust obligations." *Id.* The ICA held that the Planning Commission was required to make "appropriate assessments and require reasonable measures to protect the water resources," to employ a "higher level of scrutiny," and to place the burden on Kauai Springs to justify its proposed use of water in light of the public trust purposes:

> Based on our reading of *Kelly, Waiahole I,* and in *In re Kukui (Molokai), Inc.,* we thus hold that the Planning Commission's decision be initially grounded in the framework of the statutes and regulatory provisions that authorize the Planning Commission to act in this instance; in addition thereto, that the Planning Commission

make appropriate assessments and require reasonable measures to protect the water resources at issue in this case;

*Id.* at 429, 312 P.3d at 305 (emphasis in original).

The ICA found that although the Planning Commission's Decision and Order cited the applicable criteria for issuing the permits (citing KCC § 8–20.5 and Planning Commission Rules § 13–6), the Planning Commission's denial of the permits was not based on such criteria. *Id.* at 429–30, 312 P.3d at 305–06. Rather, the "Planning Commission essentially required Kauai Springs to prove that its water usage—and the sale of the water by the Knudsen Trust and Grove Farm's operation of the water system—were legal and met all potentially applicable regulatory requirements." *Id.*

The ICA held that such a requirement was not a "reasonable measure," as it "create[d] an obscure and indefinite burden of proof" and was "completely open-ended as to the 'applicable law'." *Id.* at 431–32, 312 P.3d at 307–08. Thus, the Decision and Order was arbitrary and capricious. *Id.*

The ICA further explained that "it was not a reasonable measure for the Planning Commission to require Kauai Springs to undertake regulatory action to establish and confirm that other parties, Knudsen Trust and Grove Farm, were in compliance with all applicable requirements and regulatory processes," particularly "given the limited and specific concerns raised by the Water Commission and the PUC." *Id.* at 432, 312 P.3d at 308. The ICA found that although the Water Commission raised some concerns about issues that could affect the water resource, these issues were "factual questions that could have been addressed directly by the Planning Commission." *Id.,* (emphasis added).

Accordingly, the ICA held that the circuit court's COL ¶ 41 was correct to the extent that it concluded the Planning Commission did not consider the proper criteria. *Id.* at 433, 312 P.3d at 309. The ICA vacated the remaining portion of COL ¶ 41 to the extent it suggested standards inconsistent with the ICA's opinion. *Id.*

The ICA held that the circuit court was correct in concluding that the Planning Commission's: COL ¶ 3 ("land use permit process should insure that all applicable requirements and regulatory processes related to water rights" are complied with), and COL ¶ 4 (there was no substantive evidence that Kauai Springs "has any legal standing and authority to extract and sell the water on a commercial basis") were wrong as a basis for denying the permits.[13] *Id.*

In regard to the Planning Commission's claim that the circuit court erred in concluding that Kauai Springs met the specific criteria set forth for the permits in the CZO and the Planning Commission Rules (COLs ¶¶ 43, 45, 59), the ICA explained that the circuit court's conclusions "appear to hold that Kauai Springs met the regulatory criteria ... for issuing the permits." *Id.* at 434, 312 P.3d at 310. However, the ICA again stated that the Decision and Order did not "address in any substantive way" the regulatory criteria. *Id.* Therefore, the ICA concluded that "it would be more appropriate to allow the Planning Commission to consider and decide whether Kauai Springs can carry its burden in meeting the requirements[.]" *Id.* The ICA thus vacated the challenged COLs and remanded to the Planning Commission to consider Kauai Springs' application for the three permits based on the specific criteria established in the CZO and the Planning Commission Rules. *Id.*

### IV. Application
#### A.

In its Application to this court, Kauai Springs raised two issues for consideration: 1) whether the ICA gravely erred in concluding that Kauai Springs impliedly assented to extend the designated time periods for consideration of the Use and Class IV Zoning permits; and 2) whether the ICA gravely erred in remanding the case to the Planning Commission, where the Planning Commission already had the opportunity to make the relevant inquiries and denied the three permits based on reasons that the circuit court

and ICA concluded were "unreasonable, arbitrary and capricious."

Regarding the first issue, Kauai Springs maintained that HRS § 91–13.5(e) does not permit extending the relevant deadlines based on an applicant's assent. Kauai Springs argued that the legislature's concern for flexibility in rulemaking, which the ICA cited, was satisfied by the option for counties to opt out of setting maximum time periods for consideration of permits.

Even assuming that an applicant could assent to an extension, Kauai Springs argued that the ICA erred in construing "post-approval cooperation" to "imply assent" to an extension of the deemed approved deadlines for the Use and Class IV Zoning permits. Kauai Springs contended that by the time it had purportedly assented to the extensions by conduct, the Use and Class IV Zoning permits had already "vested" and been deemed approved.

Finally, Kauai Springs noted that the ICA did not identify any limitation to the extension of deadlines for the Use and Class IV Zoning permits on remand. Kauai Springs argued that remanding for consideration of the Special Permit is futile, given that only eight days remain before the deadline for that permit expires.

In regard to the second issue, Kauai Springs asserted that the ICA's decision to remand the case "rests on its incorrect conclusion [that] the circuit court did not recognize" the Planning Commission's public trust duties. Kauai Springs argued that the circuit court clearly recognized its public trust duty, and it was appropriate for the circuit court to state that the Planning Commission "may" have had public trust duties "because it was not its duty to define the exact extent of [its] *Kelly* duties." Rather, it was the circuit court's duty to determine whether the Planning Commission made "appropriate assessments" and "reasonable measures," and whether the Planning Commission's denial of the permits was "unreasonable, arbitrary, or capricious."

---

**13.** The ICA then vacated the circuit court's FOF ¶ 54, which misstated the Decision and Order and the information provided by the Water Commission, and vacated the circuit court's COLs

¶¶ 73 and 74, which determined that the Water Commission and PUC had not raised substantial concerns about the permit application. *Id.*

Kauai Springs maintained that the Planning Commission possessed all of the necessary information to act on the permits and should not have been permitted to base its denial on a lack of information. Kauai Springs concluded that "the ICA's opinion serves as a blueprint for agency abuse under the guise of the public trust in every case," by allowing an agency to "issue an unreasonable and arbitrary denial" and then "argue[ ] that its own Order was lacking" because the applicant failed to seek the "right information."

### B.

On the first issue, the Planning Commission responded that Kauai Springs' conduct was reasonably interpreted as manifesting its assent to delaying final action on the Use and Class IV Zoning permits. The Planning Commission also argued that it would have been inconsistent and illogical for the Legislature to permit counties to opt out of establishing deadlines entirely, while precluding counties from permitting extensions of any deadlines based on the circumstances of the application and the applicant's assent.

In regard to the ICA ordering a remand without setting a time limit for the Planning Commission's consideration on remand, the Planning Commission noted that the ICA "remanded the case for the Planning Commission's review under specific standards and criteria, and that review necessarily will take time."

On the second issue, the Planning Commission argued that the ICA properly remanded the case upon finding the circuit court's conclusions to be erroneous. The Planning Commission argued that the circuit court did not recognize the Planning Commission's public trust duties under *Kelly*, as demonstrated by COL ¶ 63, providing that "the Record ... is devoid of any evidence that Kauai Springs['] existing or proposed use might affect water resources subject to the public trust." COL ¶ 63 was erroneous because the record clearly contained evidence that Kauai Springs' existing and proposed use of the Property directly affected a public trust resource.

The Planning Commission further argued that despite Kauai Springs' claim that the Commission argued "its own process was inadequate," the Commission consistently considered its public trust duties, and Kauai Springs failed to carry its burden of establishing that its use of water was inconsistent with the public trust.

### V. Standard of Review

#### A. Statutory Interpretation

"The interpretation of a statute is a question of law reviewable de novo." *Franks v. City & Cnty. of Honolulu*, 74 Haw. 328, 334, 843 P.2d 668, 671 (1993). This court's construction of statutes is guided by the following rules:

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature which is to be obtained primarily from the language contained in the statute itself. We must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose. When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute an ambiguity exists. If the statutory language is ambiguous or doubt exists as to its meaning, courts may take legislative history into consideration in construing a statute.

*Id.*, at 334–35, 843 P.2d at 671–72 (quotation marks and citations omitted). "It is fundamental in statutory construction that each part or section of a statute should be construed in connection with every other part or section so as to produce a harmonious whole." *State v. Davis*, 63 Haw. 191, 196, 624 P.2d 376, 380 (1981).

#### B. Agency appeals

Review of a decision made by a court upon its review of an administrative decision is a secondary appeal. The standard of review is one in which this court must determine whether the court under review was right or wrong in its decision.

To determine if the decision under review is right or wrong, we apply the standards set forth in HRS § 91–14(g) to the agency's decision.

*Leslie v. Bd. of Appeals of the Cnty. of Haw.*, 109 Hawai'i 384, 391, 126 P.3d 1071, 1078

(2006) (quotation marks and citations omitted). HRS § 91–14(g) (2012) provides:

> (g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
>> (1) In violation of constitutional or statutory provisions; or
>>
>> (2) In excess of the statutory authority or jurisdiction of the agency; or
>>
>> (3) Made upon unlawful procedure; or
>>
>> (4) Affected by other error of law; or
>>
>> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>>
>> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

▪ Additionally,

> [i]t is well settled that in an appeal from a circuit court's review of an administrative decision the appellate court will utilize identical standards applied by the circuit court. The clearly erroneous standard governs an agency's findings of fact. An agency's findings are not clearly erroneous and will be upheld if supported by reliable, probative and substantial evidence unless the reviewing court is left with a firm and definite conviction that a mistake has been made.
>
> The courts may freely review an agency's conclusions of law.

*Leslie*, 109 Hawai'i at 391, 126 P.3d at 1078 (quotation marks, brackets and citations omitted). *See Save Diamond Head Waters LLC v. Hans Hedemann Surf, Inc.*, 121 Hawai'i 16, 24, 211 P.3d 74, 82 (2009).

▪ Conclusions of law are reviewed de novo, pursuant to subsections (1), (2) and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact (FOF) are reviewable under the clearly erroneous standard, pursuant to subsection (5), and an agency's exercise of discretion is reviewed under the arbitrary and capricious standard, pursuant to subsection (6). *Save Diamond Head Waters LLC*, 121

Hawai'i at 24, 211 P.3d at 82. Mixed questions of law and fact are " 'reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case.' " *Id.* at 25, 211 P.3d at 83 (quoting *Del Monte Fresh Produce (Haw.), Inc. v. Int'l Longshore & Warehouse Union*, 112 Hawai'i 489, 499, 146 P.3d 1066, 1076 (2006)).

▪ A court reviewing the decision of an agency should ensure that the "agency ... make its findings reasonably clear. The parties and the court should not be left to guess ... the precise finding of the agency." *In re Water Use Permit Applications*, 94 Hawai'i 97, 157, 9 P.3d 409, 469 (2000) ("*Waiahole I*") (quoting *In re Kauai Elec. Div. of Citizens Utilities Co.*, 60 Haw. 166, 183, 590 P.2d 524, 537 (1978)). An agency's findings should be "sufficient to allow the reviewing court to track the steps by which the agency reached its decision." *Kilauea Neighborhood Ass'n v. Land Use Comm'n*, 7 Haw.App. 227, 230, 751 P.2d 1031, 1034 (1988). *See also In re Wai'ola O Moloka'i, Inc.*, 103 Hawai'i 401, 432, 83 P.3d 664, 695 (2004) (explaining that any presumption of validity, given to an agency's decision, "presupposes that the agency has grounded its decision in reasonably clear" findings of fact and conclusions of law).

### C. Public trust

▪ Review of an agency decision under the public trust doctrine requires additional rigor. "Clarity in the agency's decision is all the more essential 'in a case such as this where the agency performs as a public trustee and is duty bound to demonstrate that it has properly exercised the discretion vested in it by the constitution and the statute.' " *Waiahole I*, 94 Hawai'i at 158, 9 P.3d at 470 (quoting *Save Ourselves, Inc. v. La. Envtl. Control Comm'n*, 452 So.2d 1152, 1159 (La.1984)).

> [T]he special public interests in trust resources demand that this court observe certain qualifications of its standard of review. As in other cases, <u>agency decisions affecting public trust resources carry a presumption of validity.</u> The presumption is particularly significant where the appellant challenges a substantive decision with-

in the agency's expertise as "clearly erroneous," "arbitrary," "capricious," or an "abuse of discretion."

The public trust, however, is a state constitutional doctrine. As with other state constitutional guarantees, the ultimate authority to interpret and defend the public trust in Hawai'i rests with the courts of this state.

*Waiahole I,* 94 Hawai'i at 143, 9 P.3d at 455 (citations omitted) (emphasis added).

In light of the duty imposed on the state under the public trust doctrine, we have stated we must take a "close look" at agency decisions that involve the public trust. *In re Water Use Permit Applications,* 105 Hawai'i 1, 16, 93 P.3d 643, 658 (2004) ("*Waiahole II*"), *cited by In re Contested Case Hearing on Water Use Permit Application Filed by Kukui (Molokai), Inc.,* 116 Hawai'i 481, 490–91, 174 P.3d 320, 329–30 (2007) ("*Kukui (Molokai), Inc.*").

 Questions of constitutional law require the court to "exercis[e] its own independent judgment based on the facts of the case" under the right or wrong standard. *Kelly,* 111 Hawai'i at 221, 140 P.3d at 1001 (quotation marks and brackets omitted). "Under the right or wrong standard, this court examines the facts and answers the question without being required to give any weight to the trial court's answer to it." *Id.* (quotation marks and brackets omitted).

### VI. Discussion
### A.

The first issue raised is whether the ICA gravely erred in holding that Kauai Springs assented, through verbal and nonverbal conduct, to extend the automatic approval deadlines for the Use and Class IV Zoning permits.

### 1.

 HRS § 91–13.5(a) requires state and county agencies to adopt rules specifying a maximum time period for granting or denying a business or development-related permit. The statute provides that permits are "deemed approved" if the issuing agency fails to take action within the specified time period. HRS § 91–13.5(c). In conjunction thereto, KCC §§ 8–19.5(g) and 8–19.6(e) provide that an application that is not acted upon within the prescribed time limits (120 days for a special permit, 90 days for a use permit) is "deemed approved" unless the applicant assents to a delay. (Emphasis added).

Kauai Springs maintains that these ordinances permitting assent to a delay are in conflict with HRS § 91–13.5 and are therefore invalid. In support of this argument, Kauai Springs relies on HRS § 91–13.5(e), which provides that the established time period "shall be extended in the event of a national disaster, state emergency, or union strike, which would prevent the applicant, the agency, or the department from fulfilling application or review requirements." Thus, Kauai Springs maintains that the legislature authorized no other exception to the automatic approval deadline other than those circumstances specified in the statute.

 "Courts may take legislative history into consideration in construing a statute." *Life of the Land, Inc. v. City Council of City & Cnty. of Honolulu,* 61 Haw. 390, 447, 606 P.2d 866, 899 (1980), *see also Franks,* 74 Haw. at 335, 843 P.2d at 671–72. The legislative history of HRS § 91–13.5 demonstrates that the legislature was concerned that the automatic approval process should not affect the agency's ability to make an accurate determination on the application, and therefore contemplated that any established deadline could be extended with the assent of the parties.

When HRS § 91–13.5 was adopted in 1998, its purpose was "to take constructive steps to improve Hawaii's business climate" and to address concerns about the "lengthy and indeterminate time required for business and development-related regulatory approvals[.]" 1998 Haw. Sess. Laws Act 164, § 2 at 613. Thus the statute was intended "to require the establishment of maximum time periods for the review and approval of all business and development-related permit approvals," in order "to provide all parties with a greater level of certainty of the time required for review and final determination by an agency[.]" [14] *Id.*

14. The ICA noted that the County had adopted

maximum time periods for the Planning Com-

The committee reports on the bill indicate that the legislature was concerned with balancing the need to streamline the permit application process with the need for agencies to properly and thoroughly consider each application. The conference committee recognized "the continued concerns of some that automatic permit approval will be misused to short-circuit public input processes." Conf. Comm. Rep. No. 127, in 1998 Senate Journal, at 799. The committee noted that such concerns should be addressed by the agencies themselves: "Your Committee is confident that agencies will account for the preservation of such processes in their rulemaking." *Id.* Similarly, the Senate standing committee noted that "[i]n streamlining the approval process," the committee was "also mindful of environmental concerns." S. Stand. Comm. Rep. No. 2760, in 1998 Senate Journal, at 1121. The committee clarified that the bill was "not intended to jeopardize the environment" and was "intended to allow for the continued safeguard of legitimate review and public comment on those issues." *Id.* Therefore, the legislature was concerned that the automatic approval process should not affect the agency's ability to make an accurate determination on the application.

Additionally, in 2005, HRS § 91–13.5(c) was amended to provide that a delay in acting on the application caused by the lack of quorum at a regular meeting shall not result in an automatic approval of the application. 2005 Haw. Sess. Laws Act 68, § 1 at 150. The amendment also provided that "any subsequent lack of quorum at a regular meeting of the issuing agency that delays the same matter shall not give cause for further extension, unless an extension is agreed to by all parties." *Id.* (emphasis added). Thus, the statute contemplates in the context of automatic approvals that an extension may be granted by agreement of the parties, which is analogous to granting an extension by assent of the applicant. *See Black's Law Dictionary* 132 (9th ed. 2009) (defining "assent" as "[a]greement, approval, or permission").

Finally, in 2006 the statute was amended to provide that it does not apply to "[a]ny county or county agency that is exempted by county ordinance from this section." HRS

§ 91–13.5(e)(2); 2006 Haw. Sess. Laws Act 280, § 2, at 1156. The purpose of the act was "to allow a county to opt out of the automatic approval law by adopting an ordinance to exempt the county as a whole or any county agency from the automatic permit approval law." 2006 Haw. Sess. Laws Act 280, § 1, at 1156. In adopting this amendment, the legislature explained that it found automatic approval to be "poor public policy" that "can lead to negative consequences for the community." *Id.* at 1155. Due to the automatic approval law, applications for development approvals and other permits "can be granted by default." *Id.* The legislature emphasized that automatic approval was especially harmful in situations involving complex applications, which require significant time to consider public input and "various needs":

> Automatic approval eliminates the opportunity for local decision making. <u>Applications are often complex and must be carefully reviewed, which can take significant time.</u> In many situations, this is difficult because departments are understaffed and people serving on boards are volunteers. <u>Any good decision requires open public input, thorough discussion, and careful consideration of various needs from the county government, environmental interests, and community groups.</u>

*Id.* (emphases added). The legislature further explained that even when "a government body unjustifiably fails to take timely action on an application, ... the public should not have to suffer the consequences of having an ill-advised or harmful project go forward." *Id.* In support of its determination that automatic approval was "poor public policy," the legislature gave examples of counties granting applications "because it could not satisfactorily review the application within the time limits." *Id.* at 1155–56.

Based on the above, the legislative history of HRS § 91–13.5 does not indicate that it prohibits agencies from considering an applicant's assent as a reason for extending the maximum time period for acting on a permit application. *See Waikiki Resort Hotel, Inc.*

mission to act on the permits involved in this case prior to the adoption of HRS § 91–13.5.

*Kauai Springs,* 130 Hawai'i at 418, 312 P.3d at 294.

*v. City & Cnty. of Honolulu,* 63 Haw. 222, 241, 624 P.2d 1353, 1366 (1981) ("A test to determine whether an ordinance conflicts with a statute is whether it . . . permits what the statute prohibits."). On the contrary, the history of the statute demonstrates that it would be considered poor public policy for an issuing agency to make a decision on a complex permit application solely for the purpose of meeting the established deadline, where the applicant has assented to an extension of the deadline and the issuing agency is justified in taking more time to thoroughly and accurately consider the merits of the application.[15]

Accordingly, the ICA correctly determined that the assent provisions in KCC' §§ 8–19.5(g) and 8–19.6(e) do not conflict with HRS § 91–13.5. *Kauai Springs,* 130 Hawai'i at 419, 312 P.3d at 295. The Planning Commission was permitted to extend the time frame for considering Kauai Springs' application for the Use and Class IV Zoning permits based on Kauai Springs' assent to such an extension.

### 2.

■ Having determined that the applicant's assent is a valid reason for extending the time frame for acting on permits, the next issue is whether the ICA correctly determined that Kauai Springs assented to extending the automatic approval deadlines for the Use and Class IV Zoning permits in this case. *Kauai Springs,* 130 Hawai'i at 419–20, 312 P.3d at 295–296.

The circuit court concluded that Kauai Springs did not "waive" the automatic approval deadlines or "consent to" or "affirm" an extension of the deadlines by participating in the permit application process after the deadlines had passed. The circuit court concluded that time deadlines can be "waived by affirmative conduct such as an applicant requesting extra time," or by an applicant withdrawing its application. The circuit court

concluded that Kauai Springs did not ask for extra time or withdraw its application.

■ As noted by the ICA, the word "assent" is defined to mean "[a]greement, approval, or permission; esp., verbal or nonverbal conduct reasonably interpreted as willingness." *Black's Law Dictionary* 132 (9th ed. 2009). There are different types of assent, including actual, apparent, constructive, or implied assent:

> **actual assent.** Assent given by words or conduct intended to express willingness.
> **apparent assent.** Assent given by language or conduct that, while not necessarily intended to express willingness, would be understood by a reasonable person to be so intended and is actually so understood.
> **constructive assent.** Assent imputed to someone based on conduct.
> **express assent.** Assent clearly and unmistakably communicated.
> **implied assent.** Assent inferred from one's conduct rather than from direct expression.

*Id.* Although the circuit court referred interchangeably to "waiver" and "assent," the concept of waiver is distinct in that it is generally defined as an "<u>intentional</u> relinquishment of a known right." *Coon v. City & Cnty. of Honolulu,* 98 Hawai'i 233, 261, 47 P.3d 348, 376 (2002) (quotation marks omitted) (emphasis added). Although waiver may be "implied . . . by acts and conduct from which an intention to waive may be reasonably inferred," *id.* (quotation marks and brackets omitted), this is distinct from "assent," which is "conduct reasonably interpreted as <u>willingness</u>" rather than conduct reasonably interpreted as an intentional relinquishment of a known right.

The ICA held that Kauai Springs assented to a delay in the final decision on the Use and Class IV Zoning permits by participating in public hearings, amending its application, and continuing to negotiate for a conditional Use Permit after the relevant deadlines had

15. Given the legislative history of the statute, the canon of construction that "the express mention of a particular provision may imply the exclusion of that which is not included" does not support the inference that the legislature intended to prohibit counties from considering an applicant's assent as a reason for delaying a decision on an

application. *See Int'l Sav. & Loan Ass'n, Ltd. v. Wiig,* 82 Hawai'i 197, 201, 921 P.2d 117, 121 (1996) (maxim "exists only as an aid to statutory interpretation and its application should be limited to ascertaining legislative intent which is not otherwise apparent").

passed, without asserting at any point that the permits had been automatically approved. *Kauai Springs,* 130 Hawai'i at 420, 312 P.3d at 296. The ICA determined that based on the above conduct, which occurred after the deadlines had passed, the Planning Commission reasonably interpreted Kauai Springs' conduct as willingness to extend the applicable automatic approval deadlines. *Id.*

However, the ICA's reliance on post-approval conduct to find assent is inconsistent with the plain language of the relevant ordinances, which provide that Use and Class IV Zoning permits are "deemed approved" if the application is not acted upon during the established time frame, unless the applicant assents to a delay. *See* KCC §§ 8–19.5(g) and 8–19.6(e). The applicant's assent to a delay must occur prior to the deadline. Permitting an applicant to "assent" to a delay after the fact would be contrary to the purpose of establishing maximum time frames, which are intended to benefit permit applicants and "to provide all parties with a greater level of certainty of the time required for review and final determination" of an application. 1998 Haw. Sess. Laws Act 164, § 2 at 613.

Under the ICA's analysis, the time frame for acting on a permit application could be extended indefinitely based on conduct occurring after the relevant deadline had already passed; the ICA provided no limits as to when conduct could not be interpreted as retroactive assent to an extension of a deadline. It would also defeat the purpose of providing that "application approval would be automatic" if the established time frame was not met, 1998 Haw. Sess. Laws Act 164, § 2 at 613 (emphasis added), if post-approval conduct could be construed as assenting to a delay. *See Webster's Third New Int'l Dictionary* 148 (1993) (defining "automatic" as "having a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation" or "aris[ing] as ... apparently necessary reaction to or consequence of a given set of circumstances").

If the Use and Class IV Zoning permits in this case were automatically approved as of October 18, 2006 and November 2, 2006,

respectively, then any conduct occurring thereafter cannot be retroactively applied to establish "assent" to an extension of the relevant deadlines. Thus, the ICA erred by relying on post-approval conduct to find that Kauai Springs assented to an extension of the deadlines.

However, the record in this case demonstrates that Kauai Springs assented to an extension of the time frame for considering the Use and Class IV Zoning permits, prior to the deadlines for those individual permits, as both Kauai Springs and the Planning Commission treated the application for the three permits as comprising a consolidated application request. In accordance with this understanding, the parties agreed, as repeatedly evidenced by their conduct, that the Planning Commission would be required to render a decision on the consolidated application by January 31, 2007, which was the latest deadline possible for the Special Permit. Under the circumstances, this was clearly the most reasonable manner to proceed.

Kauai Springs submitted a single application for the three permits. From the outset, it was understood that Kauai Springs was required to obtain all three permits in order to continue operating its water bottling facility. The Planning Department's cease and desist letter of May 15, 2006 stated that the department found various violations of the CZO, including the "activity of processing and packaging without the proper permits" and the use of the Property "for Industrial processing and packaging purposes," which is "not generally permitted within the Agriculture District." The landowner, Makana Properties, was instructed to immediately cease and desist the above use of the Property.

Soon after, the Planning Department accepted Kauai Springs' completed application for the three permits. The Use Permit and Special Permit were the substantive permits required in order to permit Kauai Springs' proposed use, which was not otherwise permitted in the agricultural district. *See* KCC § 8–20.1 (providing that a Use Permit is required to assure proper integration into the community of uses in a district)[16]; HRS

---

**16.** KCC § 8–20.1 (1976) provides: "The purpose

of the 'use permit' procedure is to assure the

§ 205–6 (providing that a Special Permit is required to permit "certain unusual and reasonable uses" within the agricultural district).[17] The Class IV Zoning Permit was simply a procedural requirement of a Use Permit in the agricultural district. *See* KCC § 8–19.1 (prohibiting any activity or use regulated by the CZO without first obtaining the required zoning permit).[18]

Thus, in order for Kauai Springs to validly operate its water bottling facility in the agricultural district, Kauai Springs was required to obtain all three permits. Kauai Springs would not have been able to operate legally with just the Use Permit after October 18, 2006, or with just the Use Permit and Class IV Zoning Permit after November 2, 2006. Rather, Kauai Springs was required to also obtain the Special Permit, which had the latest review deadline of January 31, 2007.

From the Planning Commission's position, it would have been illogical and impractical to decide separately upon the Use Permit and Special Permit, given the similarity of the permits' requirements. A use permit may be granted only if the Planning Commission finds that the activity or use "is a compatible use" and is not detrimental or injurious to the general welfare of the community, neighborhood, land or waters. KCC § 8–20.5. Consideration of use permits are guided by the Kauai General Plan, which guides all zoning decisions pursuant to HRS § 46–4 and requires the County to "practice careful stewardship of the island's land and waters."[19] Kauai General Plan at Chapter 2, *available at* http://www.kauai.gov/Portals/0/planning/Ch2.PDF.

Similarly, a special permit may be granted only if the Planning Commission finds that the proposed use is "an unusual and reasonable use of land," after considering factors such as whether the proposed use is suitable for the uses permitted within the district or would adversely affect the surrounding property. Planning Commission Rules § 13–6. As with use permits, special permits are guided by more general objectives; special permits may only be granted for uses that "promote the effectiveness and objectives" of HRS Chapter 205, which provides that its "overarching purpose" is to "protect and conserve natural resources and foster intelligent, effective, and orderly land allocation and development." *See* HRS § 205–6(c); *Curtis v. Bd. of Appeals, Cnty. of Haw.*, 90 Hawai'i 384, 396, 978 P.2d 822, 834 (1999).

Given the similarities in standards for use and special permits, it was reasonable for all parties to expect that the Planning Commission would rely on common information to render consistent decisions on both permits. It would have been incongruous for the Planning Commission to have rendered a decision on the Use Permit by October 18, 2006, but to continue deliberating on the Special Permit until January 31, 2007, when both permits required consideration of similar standards. None of the parties treated the application as if the Planning Commission's decision-making would be divisible in this way.

Consistent with the expectation that the three permits would be considered together rather than separately, the Planning Commission accepted public oral testimony on

proper integration into the community of uses which may be suitable only in specific locations in a district, or only under certain conditions, or only if the uses are designed, arranged or conducted in a particular manner, and to prohibit such uses if the proper integration cannot be assured."

17. HRS § 205–6 (Supp.2006), entitled "Special Permit," provides that "the county planning commission may permit certain unusual and reasonable uses within agricultural and rural districts other than those for which the district is classified," provided that "the use would promote the effectiveness and objectives" of Chapter 205.

18. KCC § 8–19.1 (1976) provides: "No person shall undertake any construction or development or carry on any activity or use, for which a

zoning permit is required by this Chapter, or obtain a building permit for construction, development, activity or use regulated by this Chapter, without first obtaining the required zoning permit."

19. Pursuant to KCC § 7–1.2 (2000), the General Plan "states the County's vision for Kaua'i and establishes strategies for achieving that vision." "All actions and decisions undertaken by the County Council and the County Administration, including all County departments, agencies, boards and commissions, shall be guided by the vision statement, policies, and the implementing actions of the General Plan." KCC § 7–1.4 (2000).

the application in its entirety at the public hearings on August 8, 2006, September 26, 2006, November 14, 2006, and January 23, 2007. The minutes indicate that the public was permitted to testify generally on the application as a whole and was not restricted to testifying on any particular permit. Additionally, members of the public were permitted to continue commenting on the Use Permit after the purported deadline for the permit had passed.

Kauai Springs' conduct also confirms its expectation that the Planning Commission would treat the three permits as part of a single application. Although Kauai Springs' conduct subsequent to the established time frame for the Use and Class IV Zoning permits cannot be used to establish its post-deadline assent to an extension of the automatic deadlines, Kauai Springs' subsequent conduct was clearly consistent with and evidence of an <u>earlier</u> mutual agreement between the Planning Commission and Kauai Springs, from the onset of the application process, to treat the application for the three permits as a consolidated application and to allow the Planning Commission to render a decision on the application based on the time frame for the Special Permit.

At the November 14, 2006 hearing, after the Use Permit and Class IV Zoning Permit deadlines would have passed absent the applicant's assent, counsel for Kauai Springs amended the application request, from requesting permission to bottle 5,000 gallons a day to 1,000 gallons a day. Subsequently at the November 28, 2006 public hearing, counsel for Kauai Springs continued to negotiate for the Planning Commission to grant the Use Permit, informing the Planning Commission that Kauai Springs would be willing to accept certain conditions with the permit. There was no indication that Kauai Springs was proceeding upon a premise that the Use Permit had already been granted. At the same hearing, the Planning Commission stated, and there was no disagreement from

Kauai Springs, that the Planning Commission was required to act on the application by January 31, 2007.

In a letter dated November 28, 2006, counsel for Kauai Springs wrote to the Planning Commission, confirming that Kauai Springs was retracting its earlier amendment to the application and was again asking for permission to bottle a maximum of 5,000 gallons per day. Counsel wrote that he was "looking forward to coming to agreeable terms that are acceptable to all parties involved." In a letter dated December 1, 2006, counsel continued to negotiate the granting of the Use Permit, suggesting specific language for the proposed "non-transferability" condition.

At the January 23, 2007 meeting, the Planning Commission considered the Planning Department's recommendation to deny all three permits. Counsel for Kauai Springs reacted to the recommendation by stating that he was "really surprised." Counsel also stated that he believed the Planning Department planner had not had sufficient time to consider the application. Counsel did not argue that the Use and Class IV Zoning permits had already been approved by operation of the automatic approval ordinances. On the contrary, counsel indicated the Planning Commission could take more time to "work[ ] with conditions[.]"

At the same meeting, the Planning Department informed the Planning Commission that the "absolute deadline" for acting on the Special Permit was January 31, 2007. There was no disagreement or discussion regarding whether the other two permits had already been deemed approved. Consistent with the actions of all parties throughout the permit proceedings, the Planning Commission's Decision and Order found that "[t]he absolute deadline for action on the application based on procedures for action on Special Permits" was January 31, 2007.[20]

Thus, Kauai Springs' conduct evidences an assent agreement to consolidate the Planning

---

20. Following the entry of the Decision and Order, the Planning Commission considered Kauai Springs' request for reconsideration. At the reconsideration meeting on February 13, 2007, counsel for Kauai Springs did not take issue with the Planning Commission's finding that the absolute deadline for acting "on the application" was January 31. Rather, counsel continued to argue that the Planning Commission should grant all three permits, and specifically argued that the

Commission should continue the matter for consideration of the issues raised by OHA in its letter to the Planning Commission.

When the Planning Commission responded that voting for reconsideration would put the Planning Commission in violation of the January 31 deadline, counsel stated that Kauai Springs "would certainly be willing to waive something to avoid a hasty decision[.]" Counsel also dem-

Commission's consideration of the three permits into a single application that the Planning Commission would render a decision upon by January 31, 2007. Kauai Springs therefore assented to an extension of the time frame for decision on the Use and Class IV Permits, and the Planning Commission timely rendered its decision on all three permits.[21]

## B.

### 1.

The second issue raised by Kauai Springs' Application is whether the ICA gravely erred in remanding the case to the Planning Commission for additional findings. Kauai Springs questions whether a permit can be denied "for reasons every court concluded were unreasonable, arbitrary and capricious" "[w]hen an agency has the opportunity to make every inquiry of an applicant that it desires," and whether that agency "can claim that its own process was lacking[ ]" when that denial is challenged. The application also challenged the ICA's determination that the circuit court failed to recognize the Planning Commission's duties under the water resources public trust. Essentially, the Application contends that, given that the ICA agreed with the circuit court that the Decision and Order was arbitrary and capricious, remand is unwarranted.

To address Kauai Springs' contentions, we first address general principles and factors that an agency must consider when reviewing a permit for the use of a public resource, and then examine whether a decision to deny permits can be predicated upon the lack of information. Second, we consider whether the permits were denied upon grounds that were "unreasonable, arbitrary and capricious." Third, we determine whether the case should be remanded to the Planning Commission for clarification of its findings of fact and conclusions of law in accordance with the public trust doctrine.

### 2.

#### a.

The Hawai'i Constitution "adopt[s] the public trust doctrine as a fundamental principle of constitutional law[.]" *Waiahole I*, 94 Hawai'i at 132, 9 P.3d at 444. Article XI, section 1 declares that "all public resources are held in trust by the state for the benefit of its people" and mandates that the "State and its subdivisions shall conserve and protect" the State's water resources.[22] (Emphasis added). Article XI, section 7 reiterates that "[t]he State has an obligation to protect, control and regulate the use of Hawaii's water resources for the benefit of its people."

▬▬ "In Hawaii, this court has recognized ... a distinct public trust encompassing all the water resources of the State." [23]

---

onstrated that he was aware of the automatic approval rules, by stating that Kauai Springs was not attempting to have the Planning Commission open the matter for reconsideration in order to argue that the Planning Commission was in violation of the automatic approval rule and that the application was therefore deemed approved: "We are not trying to have you open it today and then argue that that's an automatic approval[.][W]e want to get this right. We believe there are important issues to be resolved. We are not trying to sneak anything by here." Counsel and the Planning Commission both agreed that Kauai Springs could agree to an extension of the January 31 deadline if the request for reconsideration was granted.

21. Amici contend that "deeming Kauai Springs' applications 'automatically approved,' ... would wrongly penalize ... the public trust and ... therefore, run afoul of the constitution...." In light of our determination that Kauai Springs assented to an extension of the time frame for decision on the consolidated permits and the

Planning Commission timely rendered its decision, we do not address this argument.

22. Article XI, section 1 of the Hawai'i Constitution provides:

For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State.

All public natural resources are held in trust by the State for the benefit of the people.

23. "The public trust in the water resources of this state ... has its genesis in the common law." *Waiahole I*, 94 Hawai'i at 130, 9 P.3d at 442. *See King v. Oahu Ry. & Land Co.*, 11 Haw. 717, 725 (Hawai'i Rep.1899) (holding that "[t]he people of Hawaii hold the absolute rights to all its navigable waters and the soils under them for their own common use," and "[t]he lands under

*Waiahole I*, 94 Hawai'i at 133, 9 P.3d at 445. "[T] he public trust doctrine applies to all water resources without exception or distinction." *Id.* at 133, 9 P.3d at 445 (emphasis added). "The state water resources trust thus embodies a dual mandate of 1) protection and 2) maximum reasonable and beneficial use." *Id.,* 94 Hawai'i at 139, 9 P.3d at 451. The public trust is, therefore, the duty and authority to maintain the purity and flow of our waters for future generations and to assure that the waters of our land are put to reasonable and beneficial uses. *Waiahole I,* 94 Hawai'i at 138, 9 P.3d at 450.

b.

■ Certain "fundamental principles" provide a framework for the state's "authority and duty to preserve the rights of present and future generations in the waters of the state." *Id.* at 141, 9 P.3d at 453. *Id.* As a first principle, the *authority* of the State and its political subdivisions "precludes any grant or assertion of vested rights to use water to the detriment of public trust purposes[ ]" and "empowers the state to reexamine any prior use." *Id.* Under this first principle, no person or entity has automatic vested rights to water.

■ Second, the public trust creates an "affirmative duty" of the State and its political subdivisions "to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible." *Id.* (emphasis in original) (footnote omitted) (quoting *Nat'l Audubon Society v. Superior Court of Alpine Cnty.,* 33 Cal.3d 419, 189 Cal.Rptr. 346, 658 P.2d 709, 728 (1983) cert. denied, 464 U.S. 977, 104 S.Ct. 413, 78 L.Ed.2d 351 (1983)).

■ Lastly, there are no "absolute priorities" between uses under the public trust, so the state and its subdivisions must "weigh competing public and private water uses on a case-by-case basis," according to any standards applicable by law. *Waiahole I,* 94 Hawai'i at 142, 9 P.3d at 454.

■ As the public trust arises out of a constitutional mandate, the duty and authority of the state and its subdivisions to weigh competing public and private uses on a case-by-case basis is independent of statutory duties and authorities created by the legislature. "[T]he public trust doctrine at all times forms the outer boundaries of permissible government action[.]" *Id.* at 132, 9 P.3d at 444, (quoting *Kootenai Envtl. Alliance v. Panhandle Yacht Club, Inc.,* 105 Idaho 622, 671 P.2d 1085, 1095 (1983)). Therefore "mere compliance by agencies with their legislative authority" may not be sufficient to determine if competing uses are properly balanced in the context of uses protected by the public trust and its foundational principals. *Waiahole I,* 94 Hawai'i at 132, 9 P.3d at 444.

c.

■ The purpose of the state water resource public trust is to protect certain uses. Our jurisprudence has referred to these protected uses as the "purposes" of the water resource public trust; in this context "protected use" and "purpose" are synonymous. *See Waiahole I,* 94 Hawai'i at 136, 9 P.3d at 448 (equating purpose and use). We have recognized four such protected uses. First, "the maintenance of waters in their natural state constitutes a distinct 'use' " that the public trust protects.[24] *Id.* at 136, 9 P.3d at 448. Second, the public trust protects domestic water use, in particular, protecting an adequate supply of drinking water. *Id.* at 136–37, 9 P.3d at 449–50. Third, the public trust protects the use of water in "the exercise of Native Hawaiian and traditional and customary rights[.]" *Id.* at 137, 9 P.3d at 450. Lastly, the reservation of water enumerated by the State Water Code constitutes a protected use under the public trust. *Wai'ola O Moloka'i,* 103 Hawai'i at 431, 83 P.3d at 694.

the navigable waters in and around the territory of the Hawaii Government are held in trust for the public uses of navigation") (citations omitted).

**24.** "This disposes of any portrayal of retention of waters in their natural state as 'waste.' " *Waia-*

*hole I,* 94 Hawai'i at 136–37, 9 P.3d at 448–49. *See also Reppun v. Bd. of Water Supply,* 65 Haw. 531, 560 n. 20, 656 P.2d 57, 76 n. 20 (1982) (citing article XI, section 1 of the Hawai'i Constitution as an acknowledgment of the public interest in "a free-flowing stream for its own sake").

Private commercial use is not protected by the public trust. "[T]he public trust has never been understood to safeguard rights of exclusive use for private commercial gain." *Waiahole I*, 94 Hawai'i at 138, 9 P.3d at 450. The very meaning of the public trust is to recognize separate and enduring public rights in trust resources superior to any private interest. *Id.* In accordance with the fundamental principles of the public trust and the fact that private commercial use is not one of the uses the public trust protects, a "higher level of scrutiny" is therefore employed when considering proposals for private commercial use. *Id.* at 142, 9 P.3d at 454.

d.

When an agency is confronted with its duty to perform as a public trustee under the public trust doctrine, it must preserve the rights of present and future generations in the waters of the state. *Waiahole I*, 94 Hawai'i at 141, 9 P.3d at 453. An agency must take the initiative in considering, protecting, and advancing public rights in the resource at every stage of the planning and decision-making process. *Id.* at 143, 9 P.3d at 455. The agency measures the proposed use under a "reasonable and beneficial use" standard, which requires examination of the proposed use in relation to other public and private uses. *Id.* at 161, 9 P.3d at 473. The agency must apply a presumption in favor of public use, access, enjoyment, and resource protection. *Id.* at 142, 154 n. 59, 9 P.3d at 454, 466 n. 59.

The agency is duty-bound to place the burden on the applicant to justify the proposed water use in light of the trust purposes. *Kukui (Molokai), Inc.*, 116 Hawai'i at 490, 174 P.3d at 329. Permit applicants must demonstrate their actual needs, and, within the constraints of available knowledge, the propriety of draining water from public streams to satisfy those needs. *Waiahole I*, 94 Hawai'i at 162, 9 P.3d at 474. If there is a reasonable allegation of harm to one of the uses protected by the public trust, then the applicant must demonstrate that there is no harm in fact or that any potential harm does not preclude a finding that the requested use is nevertheless reasonable and

beneficial. *Kukui (Molokai), Inc.*, 116 Hawai'i at 499, 174 P.3d at 338.

The applicant is "obligated to demonstrate <u>affirmatively</u> that the proposed [use] [will] <u>not</u> affect [a protected use], in other words, the absence of evidence that the proposed use would affect [a protected use] [is] insufficient[.]" *Wai'ola O Moloka'i*, 103 Hawai'i at 442, 83 P.3d at 705 (emphases in original). *See also Kukui (Molokai), Inc.*, 116 Hawai'i at 509, 174 P.3d at 348 ("[ T] he [Water Commission's] conclusion that 'no evidence was presented' ... that the [protected use] would be adversely affected erroneously shifted the burden of proof[.]")

Additionally, the applicant must demonstrate the absence of a practicable alternative water source. *Waiahole I*, 94 Hawai'i at 161, 9 P.3d at 473. The applicant's proposed use must be denied if the applicant does not show that there is no practicable alternative water source. *Id.* at 161 n. 65, 9 P.3d at 473 n. 65. "Such a requirement is intrinsic to the public trust." *Id.; see also Kukui (Molokai), Inc.*, 116 Hawai'i at 496, 174 P.3d at 335 ("The [agency] cannot fairly balance competing interests in a scarce public trust resource if it renders its decision prior to evaluating the availability of alternative sources of water.").

Lastly, if the impact is found to be reasonable and beneficial, then in light of the cumulative impact of existing and proposed diversions on trust purposes, the applicant must implement reasonable measures to mitigate this impact. *Waiahole I*, 94 Hawai'i at 143, 161, 9 P.3d at 455, 473.

When an agency or other deciding body considers an application for permits under circumstances that requires the deciding body to perform as a public trustee to protect a public trust resource, the agency or other deciding body must make findings sufficient to enable an appellate court to track the steps that the agency took in reaching its decision. *Kilauea Neighborhood Ass'n*, 7 Haw.App. at 230, 751 P.2d at 1034. An agency is encouraged to be clear; "clarity in the agency's decision is all the more essential ... where the agency performs as a public trustee and is duty bound to demonstrate

that it has properly exercised the discretion vested in it by the constitution and the statute." *Waiahole I*, 94 Hawai'i at 158, 9 P.3d at 470 (quotation marks omitted).

### e.

Under the foregoing principles and purposes of the public trust, it is manifest that a government body is precluded from allowing an applicant's proposed use to impact the public trust in the absence of an affirmative showing that the use does not conflict with those principles and purposes. Therefore, the applicant is "obligated to demonstrate affirmatively that the proposed [use] [will] not affect [a protected use]," *Wai'ola O Moloka'i*, 103 Hawai'i at 442, 83 P.3d at 705 (emphases omitted). In other words, "the absence of evidence that the proposed use would affect [a protected use] [is] insufficient[.]" *Id.* (emphasis added). Kauai Springs has asserted "the public trust doctrine imposes a duty to assess, but does not empower an agency to deny an application simply because it claims it lacks information within its power to obtain, thus shifting the burden to the applicant." However, contrary to Kauai Springs' assertion, a lack of information from the applicant is exactly the reason an agency is empowered to deny a proposed use of a public trust resource.

### f.

To assist agencies in the application of the public trust doctrine, we distill from our prior cases the following principles: [25]

a. The agency's duty and authority is to maintain the purity and flow of our waters for future generations and to assure that the waters of our land are put to reasonable and beneficial use.[26]

b. The agency must determine whether the proposed use is consistent with the trust purposes:

 i. the maintenance of waters in their natural state;

 ii. the protection of domestic water use;

 iii. the protection of water in the exercise of Native Hawaiian and traditional and customary rights; and

 iv. the reservation of water enumerated by the State Water Code.

c. The agency is to apply a presumption in favor of public use, access, enjoyment, and resource protection.[27]

d. The agency should evaluate each proposal for use on a case-by-case basis, recognizing that there can be no vested rights in the use of public water.[28]

e. If the requested use is private or commercial, the agency should apply a high level of scrutiny.[29]

f. The agency should evaluate the proposed use under a "reasonable and beneficial use" standard, which requires examination of the proposed use in relation to other public and private uses.[30]

Applicants have the burden to justify the proposed water use in light of the trust purposes.[31]

a. Permit applicants must demonstrate their actual needs and the propriety of draining water from public streams to satisfy those needs.[32]

b. The applicant must demonstrate the absence of a practicable alternative water source.[33]

c. If there is a reasonable allegation of harm to public trust purposes, then the applicant must demonstrate that there is no harm in fact or that the requested use is nevertheless reasonable and beneficial.[34]

25. We provide this framework for assistance and do not indicate that it is mandatory or that it precludes other analytical approaches that are consistent with the public trust doctrine.

26. *Waiahole I*, 94 Hawai'i at 138, 9 P.3d at 450.

27. *Id.* at 142, 154 n. 59, 9 P.3d at 454, 466 n. 59.

28. *Id.* at 141, 9 P.3d at 453; *Kukui (Molokai), Inc.*, 116 Hawai'i at 490, 174 P.3d at 329.

29. *Waiahole I*, 94 Hawai'i at 142, 9 P.3d at 454.

30. *Id.* at 161, 9 P.3d at 473.

31. *Kukui (Molokai), Inc.*, 116 Hawai'i at 490, 174 P.3d at 329.

32. *Waiahole I*, 94 Hawai'i at 162, 9 P.3d at 474.

33. *Id.* at 161, 9 P.3d at 473.

34. *Kukui (Molokai), Inc.*, 116 Hawai'i at 499, 174 P.3d at 338.

d. If the impact is found to be reasonable and beneficial, the applicant must implement reasonable measures to mitigate the cumulative impact of existing and proposed diversions on trust purposes, if the proposed use is to be approved.[35]

3.

■ In this case, the parties do not dispute that the Planning Commission had public trust duties.[36] Therefore, the Planning Commission was "duty-bound to place the burden on the applicant to justify the proposed water use in light of the trust purposes and weigh competing public and private water uses on a case-by-case basis, requiring a higher level of scrutiny for private commercial water usage." *Waiahole II*, 105 Hawai'i at 16, 93 P.3d at 658 (quotation marks and brackets omitted).

The ICA recognized, and we concur, that "[ t]o its credit, the Planning Commission took seriously its public trust duty ... by, inter alia, investigating the water source and the transmission of the water, seeking comment from a number of county and state agencies, and holding several hearings and seeking input from the community related to Kauai Springs' application for the permits." *Kauai Springs*, 130 Hawai'i at 431, 312 P.3d at 307. It is also apparent that the Planning Commission applied a high level of scrutiny when it examined Kauai Springs' proposed private commercial use.[37]

We now address the question as to whether the findings and conclusions of the Planning Commission, viewed in the light of the duties and authority mandated by the public trust, were arbitrary or capricious.

a.

In COL ¶ 4, the Planning Commission concluded that the record was devoid of evidence that Kauai Springs or its commercial water supplier(s) had legal standing to extract or sell the water on a commercial basis.

4. There is no substantive evidence that the Applicant has any legal standing and authority to extract and sell the water on a commercial basis.

(Emphasis added). In accordance with the public trust doctrine, it was clearly within the exercise of the Planning Commission's authority to require Kauai Springs to affirmatively demonstrate its right to extract water, which depended on Kauai Springs' commercial supplier(s) having legal authority to sell the water to Kauai Springs.

■ A fundamental principle of the public trust doctrine precludes assertion of prior uses or vested rights to use water to the detriment of public trust purposes. *Waiahole I*, 94 Hawai'i at 141, 9 P.3d at 453. The Planning Commission's requirement that Kauai Springs demonstrate its "legal standing and authority" is therefore consistent with the Planning Commission's duty and authority to reexamine any prior use and "revisit prior diversions" in order to "preserve the rights of present and future generations in the waters of this state." *Id.* The burden imposed by the Planning Commission on Kauai Springs to demonstrate its legal authority to the proposed use was a properly imposed affirmative obligation. *See, e.g., Wai'ola O Moloka'i*, 103 Hawai'i at 442, 83 P.3d at 705 (holding that an applicant is "obligated to demonstrate affirmatively that the proposed [use] [will] not affect [a protected use]"). Further, the Planning Commis-

---

**35.** *Waiahole I*, 94 Hawai'i at 143, 161, 9 P.3d at 455, 473.

**36.** The ICA held that the circuit court's COLs ¶ 63 (record was "devoid of any evidence that Kauai Springs['] existing or proposed uses might affect water resources subject to the public trust"), ¶ 71 and ¶ 72 (suggesting that Planning Commission "may" have public trust duties in this case) were "incorrect in that they do not recognize the Planning Commission's public trust duty to consider and review Kauai Springs' water usage in its water bottling operation." *Kauai Springs*, 130 Hawai'i at 423, 312 P.3d at 299.

In its Application, Kauai Springs does not challenge the ICA's conclusion that the Planning Commission had a duty to consider Kauai Springs' water usage in reviewing its permit application. Rather, Kauai Springs argues that the ICA erred in vacating the circuit court's COLs because the circuit court recognized the Planning Commission's public trust duties and correctly found that the Planning Commission fulfilled these duties.

**37.** It is undisputed that Kauai Springs' use of the public trust resource was commercial.

sion's requirement that Kauai Springs demonstrate its legal authority to extract the water was in keeping with the presumption in favor of the purposes of the public trust, public use, access, and enjoyment. *Waiahole I,* 94 Hawai'i at 142, 9 P.3d at 454.

The Planning Commission's request for clarification from the Water Commission hypothesized the condition that "[t]he existing source has been registered and is basically grandfathered[.]" Those conditions were not, in fact, verified, as noted by the ICA. *Kauai Springs,* 130 Hawai'i at 433, n. 22, 312 P.3d at 309. Nor is there any indication in the record as to what was meant by "registered" or "grandfathered." [38] Additionally, "existing uses are not automatically 'grandfathered' under the constitution ... especially in relation to public trust uses." *Waiahole I,* 94 Hawai'i at 149, 9 P.3d at 461 (emphasis added). "The public trust doctrine takes precedent even over vested water rights." *Id.* at 141, 9 P.3d at 453 (quoting *Kootenai,* 671 P.2d at 1094).

Kauai Springs failed to provide any evidence that it had legal authority to the commercial use of the public trust water resource. There is also no indication in the record of the substance of any water purchase agreement, nor of the water supplier's right to make the public trust resource commercially available. Under the higher scrutiny given to private commercial use, it was within the Planning Commission's authority to review any purchase arrangements it found relevant, and it was Kauai Springs' burden to produce documentation of any agreements or contracts to determine what legal rights Kauai Springs had to extract the water.[39]

Consequently COL ¶ 4 is correct in that "[t]here was no substantive evidence that

[Kauai Springs] ha[d] any legal standing and authority to extract and sell the water on a commercial basis." Furthermore, in light of the responsibility of the Planning Commission to protect the public trust resource, it was appropriate for the Planning Commission to inquire into Kauai Springs' legal standing and authority to extract water for the proposed use.

b.

The Planning Commission's COL ¶ 3 places a burden on Kauai Springs to demonstrate its satisfaction of regulatory requirements by other agencies. That conclusion states:

> In view of the comments from [the Water Commission] and PUC the land use permit process should insure that all applicable requirements and regulatory processes relating to water rights, usage, and sale are satisfactorily complied with prior to taking action on the subject permits. The Applicant, as a party to this proceeding should also carry the burden of proof that the proposed use and sale of the water does not violate any applicable law administered by [the Water Commission], the PUC or any other applicable regulatory agency.

(Emphasis added). COL ¶ 3 is first a statement that a permit should not be issued if applicable requirements and regulatory processes are unsatisfied, and second, an application of that statement to Kauai Springs. We initially consider "applicable requirements and regulatory processes" that must be satisfied in order for a permit to be issued.

In regards to both the Use Permit and Special Permit, pursuant to HRS § 46–4(a) (Supp.2006), zoning in the County is required

---

**38.** The record indicates that the Water Commission "assigned" Well No. 5729–01 to the water source on November 20, 2006, based on a November 6, 2006 letter from the Planning Commission. The well number assignment does not appear to have been requested prior to November 6, 2006, nor by Knudsen Trust, Grove Farm, or Kauai Springs. It is not clear what rights, if any, are conveyed to any party by assignment of a well number.

**39.** An instructive demonstration of the burden on the applicant is provided by *Wai'ola O Moloka'i.*

In that case, notwithstanding our ultimate remand, this court found that the Water Commission *had* met its public trust duty to balance an existing use against the proposed use only after the Water Commission found that the applicant had provided two hydrologic studies that showed that the impact of the proposed use would have no or relatively small impact on the existing use. *Wai'ola O Moloka'i,* 103 Hawai'i at 432–33, 83 P.3d at 695–96 (remanded to the Water Commission on other grounds).

to be accomplished within the framework of Kauai's General Plan. Kauai's General Plan provides that Kauai's county governments will "practice careful stewardship of the island's land and waters" and manage the "high mountains, forested watershed areas, the ocean and coral reefs, [and] beaches ... as part of the public lands trust." Kauai General Plan at 2–3. Therefore, neither the Use Permit nor the Special Permit could be issued if issuance would not be in keeping with careful stewardship of the island's waters.

The purpose of the Use Permit, according to the CZO, "is to assure the proper integration into the community of uses which may be suitable only in specific locations in a district ... and to prohibit such uses if proper integration cannot be assured." KCC § 8–20.1. Additionally, the CZO provides that a Use Permit and Class IV Zoning Permit may only be granted if the Planning Commission finds that the proposed use or activity "will not cause any substantial harmful environmental consequences on the land of the applicant or on other lands or waters, and will not be inconsistent with the intent [of the CZO] and the General Plan." KCC § 8–20.5. Therefore, the Planning Commission could not issue the Use Permit unless it found that issuance would not cause substantial harmful environmental consequences to the water.

Relevant to the Special Permit, HRS § 205–6 provides that the Planning Commission may only grant the special permit for "certain unusual and reasonable uses" within the agricultural district "when the use would promote the effectiveness and objectives" of HRS Chapter 205. The express purpose of HRS Chapter 205 is to conserve "water resources and land." *Curtis v. Bd. of Appeals, Cnty. of Haw.*, 90 Hawai'i 384, 396, 978 P.2d 822, 834 (1999) (citing Hse. Stand. Comm. Rep. No. 395, in 1961 House Journal, at 855–56). Therefore, the Planning Commission was required to deny the Special Permit if issuance was contrary to the protection of natural resources.

As previously discussed, the Planning Commission also had duties under the public trust independent of the permit requirements, including the duty to place the burden on the applicant to demonstrate "the *propriety* of draining water from public streams[.]"

*Waiahole I,* 94 Hawai'i at 132, 162, 9 P.3d at 444, 474 (emphasis added); *Kukui (Molokai), Inc.,* 116 Hawai'i at 490, 174 P.3d at 329.

In light of the Planning Commission's constitutionally-mandated duties under the public trust doctrine to require the applicant to demonstrate the propriety of the proposed use, and the requirements of the Use Permit and Special Permit to protect the environment, water, and natural resources, the first statement in COL ¶3 correctly states that the permitting process "should insure that all applicable requirements and regulatory processes relating to water rights, usage, and sale are satisfactorily complied with prior to taking action on the subject permits."

The second statement in COL ¶3, that Kauai Springs "should carry the burden of proof that the proposed use and sale of the water does not violate any applicable law administered by [the Water Commission], the PUC or any other applicable regulatory agency" should not be read in a vacuum. The ICA found that "any other applicable regulatory agency" created "an obscure and indefinite burden of proof" that is "open-ended as to the 'applicable law[.]'" *Kauai Springs,* 130 Hawai'i at 431, 312 P.3d at 307. Here, the Planning Commission in its FOF found specific applicable requirements and regulatory processes relating to water rights that were, in fact, unsatisfied.

In November 2006, the Planning Commission sought input from other agencies in order to determine Kauai Springs' "authority and right to obtain and extract the water for commercial purposes." As a result of this effort, the Planning Commission found that "there may be outstanding regulatory processes ... that [Kauai Springs] must satisfy." In particular, the Planning Commission found that there may be unsatisfied regulatory requirements from the Water Commission and the PUC. *Id.*

The Planning Commission was informed by the Water Commission of three potentially applicable permits implicated by Kauai Springs' proposed use of the public trust resource. First "[g]round-water withdrawals from [Kauai Springs' proposed use] may affect streamflows, which may require an in-

stream flow standard amendment."[40] Second, a pump installation permit would be required if a pump is installed at the water source to induce additional water flow.[41] Third, a well modification permit from the Water Commission may be required "if the [water] source needs to be modified in any way[.]"[42] (Emphasis added).

Subsequently, the Planning Commission visited the site where the tunnel water system originates. The visit found "a concrete stem wall was constructed at the bottom of the tunnel entrance ... and a steel panel was mounted over the tunnel entrance." Therefore, the Planning Commission confirmed that the source of the water and the tunnel may have been modified, and thus may have required additional permitting.

The Planning Commission found similar concerns as to the propriety of Kauai Springs' proposed use due to potential regulatory jurisdiction by the PUC. A representative of Grove Farm testified to the Planning Commission that there had never been communications with the PUC regarding its water system. The Planning Commission was informed by the PUC that although Kauai Springs' bottling operations were not subject to PUC regulation, it was possible that Grove Farm was operating as a public utility. Specifically, the Planning Commission was informed that whether Grove Farm was operating as a public utility would depend, in part, on "the amount of control, if any, its

customers may be able to exert over Grove Farm's water systems and its operations." (Emphasis added). Based on this information, the Planning Commission concluded that Kauai Springs' planned use of the water through its purchase from Grove Farm could subject the operation to PUC jurisdiction, notwithstanding that as an independently operating entity, Kauai Springs would not normally be subject to such regulation.[43] The Planning Commission stated that

> the PUC also draws interest to the extent that as [a] purchaser of water from Grove Farm, the operation may be subject to PUC regulation. The PUC in this regard encourages that a declaratory ruling be sought to allow more diligent review of the relevant facts and information associated with the proposed water bottling facility.

(Emphases added). The Planning Commission did not require Kauai Springs, or any other party, to initiate such a proceeding.[44]

Accordingly, based on responses from the Water Commission, the PUC, and its own site visit, the Planning Commission identified specific statutory requirements of the Water Commission and PUC that it reasonably believed were applicable and unsatisfied. Kauai Springs presented no evidence regarding the inapplicability or satisfaction of the conditions outlined by the Water Commission. Kauai Springs also offered no information on the issue of whether its operation would affect Grove Farm's status as a public

---

**40.** "Instream flow standard" means a quantity or flow of water or depth of water which is required to be present at a specific location in a stream system at certain specified times of the year to protect fishery, wildlife, recreational, aesthetic, scenic, and other beneficial instream uses. HRS § 174C–3. Instream flows are regulated by the Water Commission. HRS 174C–71. The Water Commission set instream flow standards for Kauai in 1988. Haw. Admin. Rules § 13–169–45. Instream flows cannot be diminished (i.e., additional water cannot be extracted) without petitioning the Water Commission. HRS § 174C–71.

**41.** The Water Commission regulates wells and pumps under HRS §§ 174C–81 though 174C–87.

**42.** *Id.*

**43.** The Dissent suggests that because Grove Farm is not a party to Kauai Springs' permit applications, review of the operation by the PUC

would not further the purposes of the public trust and that it would be unfair to Kauai Springs if Grove Farm declined to pursue such review. Dissent at 182, 324 P.3d at 992. However, Grove Farm is involved both through its individual involvement in the sale or licensing of the trust resource to Kauai Springs and its combined involvement of providing water to an entity commercially bottling and selling public water. Under the analysis of the Dissent, Grove Farm or Knudsen trust could sell or license the public trust resource to third-party bottlers without any review whatsoever. The purposes of the public trust proscribe exactly such a result. Further, it is noted that a consultant representative of Grove Farm testified in support of Kauai Springs' permit applications at the November 14, 2006 Planning Commission hearing.

**44.** Kauai Springs may satisfy its burden regarding its use of a public trust resource in a manner satisfactory to the Planning Commission as set forth in this opinion.

utility. Therefore, the Planning Commission's statement in FOF ¶ 19 that "there may be outstanding regulatory processes ... that [Kauai Springs] must satisfy[ ]" is correct.[45]

Read in the context of FOF ¶ 19, it is clear that COL ¶ 3's statement that Kauai Springs should "carry the burden of proof that the proposed use and sale of the water does not violate any applicable law administered by [the Water Commission], the PUC or any other applicable regulatory agency" was not intended to create an "obscure and indefinite burden of proof." *Kauai Springs*, 130 Hawai'i at 431, 312 P.3d at 307. On the contrary, the Planning Commission correctly imposed on Kauai Springs the burden to demonstrate the propriety of its proposed use of the public trust resource, which, under the circumstances of this case, required Kauai Springs to demonstrate that any nec-

essary permits and applicable regulations from the Water Commission and PUC were complied with.[46] In light of the duties of the Planning Commission to preserve the rights of present and future generations in the waters of the state, this burden is not unreasonable. Therefore, COL ¶ 3 is correct.

c.

The Planning Commission's COL ¶ 4 is correct because its authority under the public trust permitted it to inquire into Kauai Springs' legal rights to extract the water for commercial use. COL ¶ 3 was correct because the Planning Commission's duties under the public trust required it to ensure that Kauai Springs' proposed use was in compliance with Water Commission and PUC requirements. Therefore, the Decision and Or-

---

45. The ICA improperly shifted the burden to the Planning Commission to disprove harm to the public trust resource. The ICA stated that "a denial of the permits ... would be appropriate under the public trust doctrine <u>if modification of the water source or installation of a pump would jeopardize the water</u>." *Kauai Springs*, 130 Hawai'i at 432, 312 P.3d at 308 (emphasis added). It is incorrect to suggest that a denial of the permit is only permissible if the water is "jeopardized." Under the public trust doctrine, the Planning Commission is empowered to deny use of the trust resource if Kauai Springs failed to show that the water will <u>not</u> be jeopardized. *Waiahole I*, 94 Hawai'i at 142–43, 9 P.3d at 454–55; *Kukui (Molokai), Inc.*, 116 Hawai'i at 490, 509, 174 P.3d at 329, 348 ("[T]he [Water Commission's] conclusion that 'no evidence was presented' ... that the [protected use] would be adversely affected erroneously shifted the burden of proof[.]'").

Similarly, the ICA found that "[w]ith regard to the concern raised ... that Grove Farm may possibly be ... subject to PUC regulation, there is nothing ... that suggests the water resources are in jeopardy or affected without PUC regulation of Grove Farm as a public utility." *Kauai Springs*, 130 Hawai'i at 432, 312 P.3d at 308. The ICA's analysis misstates the burden of proof in application for use of public trust resources; it was Kauai Springs' responsibility to demonstrate that the propriety of its water usage by showing the water was to be obtained from a validly operating entity. *Waiahole I*, 94 Hawai'i at 142–43, 9 P.3d at 454–55; *Kukui (Molokai), Inc.*, 116 Hawai'i at 490, 174 P.3d at 329. The Dissent adopts this same improper burden shifting regarding jeopardy to the water resource. Dissent at 184, 324 P.3d at 994.

The Dissent similarly shifts the burden to disprove harm to the public trust resource from the

applicant to the Planning Commission in contending that there was nothing in the record to suggest that a well-modification permit, a pump installation permit, or a petition for an interim flow stream standard was required. Dissent at 184–85, 324 P.3d at 994–95. In addition to improperly shifting the burden, the record does suggest that a well modification permit may have been required. As noted above, the Planning Commission had conducted a site visit and confirmed that a concrete stem wall and steel panel had been mounted over the face of the tunnel, indicating that a well modification permit may have been warranted. The Dissent also suggests that the stem wall and steel panel may originate from the 1890s. The record does not date the wall and panel installation. Photographs of the wall and panel in the record do not indicate construction of an 1890s vintage.

46. The Dissent posits a parade of oblique scenarios by suggesting that the Kauai building division or elevator inspectors would have to undertake a review of the public trust doctrine before issuing the relevant permits. Dissent at 183–184, 324 P.3d at 993–94. The obvious distinction is that a permit for an elevator would not state that the applicant is "requesting a permit for water harvesting ..." as it did in this case. Further, it is not clear that any statute or regulation requires the building division or elevator inspectors to consider the impact of a permit on the environment or in conformance with the General Plan, as the applicable statutes and regulations did require of the Planning Commission here. The public trust does not "impose[ ] a burden to disprove all potentialities unrelated to the protection or conservation of water resources." Dissent at 184, n. 4, 324 P.3d at 994, n. 4.

der to deny the permits was not arbitrary or capricious.[47]

4.

The Dissent contends that the ICA recognized the proper test for the Planning Commission to employ when applying the public trust doctrine. Dissent at 184, 324 P.3d at 994. The ICA stated that the Planning Commission's decision should

> be initially grounded in the framework of the statutes and regulatory provisions that authorize the Planning Commission to act in this instance; in addition thereto, that the Planning Commission [should] make appropriate assessments and require reasonable measures to protect the water resources at issue in this case; and because Kauai Springs seeks to use the water for economic gain, this case requires that the Planning Commission give the permit application a higher level of scrutiny and, although Kauai Springs' use of the water is not illegal or improper *per se*, that Kauai Springs carries the burden to justify the use of the water in light of the purposes protected by the public trust.

*Kauai Springs,* 130 Hawai'i at 429, 312 P.3d at 305 (emphases added). This test is not in conformance with our prior holdings.

Our cases have used the term "reasonable measures" to indicate that *if* the impact is found to be reasonable and beneficial in light of the cumulative impact of existing and proposed diversions on trust purposes, then the applicant must implement reasonable measures to mitigate this impact. *Waiahole I,* 94 Hawai'i at 143, 161, 9 P.3d at 455, 473. Therefore, reasonable measure are indicated only after the use has been determined to be beneficial.

Similarly, the phrase "appropriate assessments" is used in *Kelly v. 1250 Oceanside Partners* to refer to efforts by the defendant County of Hawai'i to assess whether a landowner had reasonable erosion control measures in place; that is, to ascertain whether "reasonable measures" were being adequate-

ly complied with. 111 Hawai'i 205, 228, 140 P.3d 985, 1008 (2006). In *Kelly,* we held that duties under the public trust "require[ ] [an agency] ... to ensure that the prescribed measures are actually being implemented after a thorough assessment of the possible adverse impacts the development would have on the State's natural resources." *Kelly,* 111 Hawai'i at 231, 140 P.3d at 1011. "Appropriate assessments" therefore refers to efforts by the state or an agency to ensure "reasonable measures" are implemented after permits are granted.

At a minimum, the test crafted by the ICA is incorrect because it inverts the public trust doctrine by mandating appropriate assessments and reasonable measures be evaluated before assessing the propriety of the proposed use in light of the public trust purposes. Additionally, the standard does not require the agency to consider all of the factors protecting the public trust resource. *See generally Waiahole I,* 94 Hawai'i 97, 9 P.3d 409 (2000) *and Kukui (Molokai), Inc.,* 116 Hawai'i 481, 174 P.3d 320 (2007). For instance, the ICA's proposed test does not require a demonstration of the absence of practicable alternative water sources. *Waiahole I,* 94 Hawai'i at 161, 9 P.3d at 473. ("Such a requirement is intrinsic to the public trust[.]"). Therefore, the ICA's proposed test is deficient because it does not provide the degree of protection of the public trust required by the law that our prior holdings recognize.

5.

For the foregoing reasons, we conclude that the ICA erred in its determination that the Planning Commission's COL ¶¶ 3 and 4 were wrong. The ICA also erred in affirming the circuit court's conclusion that the Planning Commission did not use proper criteria in reviewing Kauai Springs' permit application. The ICA's vacation of the circuit court's conclusion regarding proper criteria was correct to the extent that the circuit

---

47. The Dissent characterizes the review of the Decision and Order as "crafting an outcome that neither party sought." Dissent at 182–83, 324 P.3d at 992–93. Kauai Springs specifically raised the issue of whether the Decision and Order was arbitrary and capricious, and this issue was an

essential component of the circuit court and ICA decisions. Therefore, this court could not review whether the Decision and Order of the Planning Commission was arbitrary and capricious without considering whether it was premised upon sound findings and conclusions.

court suggested applicable standards inconsistent with this court's decision.

The Application specifically challenged the ICA's determination that the circuit court's conclusions were incorrect in COL ¶ 63, 71, 72. In those conclusions the circuit court determined that: there was no evidence that Kauai Springs' proposed use would affect water resources protected by the public trust, (COL 63); the Planning Commission did not identify any outstanding regulatory processes that must be fulfilled in order to satisfy any duty under the public trust, (COL 71); and the Planning Commission fulfilled any duty it had under the public trust, (COL 72). Based on the discussion presented above, we affirm the ICA's vacation of the circuit court's COL ¶¶ 63, 71 and 72.[48]

Ultimately, while the Planning Commission's findings of fact were not erroneous and its conclusions of law correct, and therefore its decision to deny the permits was not arbitrary and capricious, nevertheless clarity and completeness in the Planning Commission's FOF and COL are essential when it performs as a public trustee.[49] *Waiahole I*, 94 Hawai'i at 158, 9 P.3d at 470 ("clarity in the agency's decision is all the more essential ... where the agency performs as a public trustee and is duty bound to demonstrate that it has properly exercised the discretion vested in it by the constitution and the statute").

Accordingly, we remand this matter to the Planning Commission to clarify its findings and conclusions consistent with this opinion. *Waiahole I*, 94 Hawai'i at 158, 9 P.3d at 470 (citing *Application of Kauai Elec. Div. of Citizens Utilities Co.*, 60 Haw. 166, 185–86, 590 P.2d 524, 537–38) (recognizing remand as an appropriate remedy "where the agency has made invalid, inadequate, or incomplete findings"); *cf. In re Kukui (Molokai), Inc.*,

116 Hawai'i at 495, 174 P.3d at 334 (finding that the Water Commission failed to explain the rationale behind its decision and remanding for additional findings and conclusions).

## VII. Conclusion

For the foregoing reasons, the ICA Judgment on Appeal filed May 30, 2013 is affirmed to the extent that it vacated the Final Judgment filed by the Circuit Court of the Fifth Circuit on September 23, 2008, and we remand this case to the Planning Commission for further proceedings consistent with the opinion of this court.

### Concurring and Dissenting Opinion by RECKTENWALD, C.J.

This case requires us to further define the contours of the public trust doctrine with respect to water resources. The public trust doctrine in Hawai'i is a matter of "constitutional mandate." *In re Water Use Permit Applications ("Waiahole I")*, 94 Hawai'i 97, 131, 9 P.3d 409, 443 (2000). The doctrine is enshrined in article XI, section 1 of the Hawai'i Constitution, which declares that, "the State and its political subdivisions shall conserve and protect ... all natural resources, including ... water ... and shall promote the development and utilization of these resources ... in a manner consistent with their conservation," and which further mandates that "[a]ll public natural resources are held in trust for the benefit of the people." It is beyond dispute that the public trust doctrine applies to all water resources in the State, without exception or distinction. *In re Water Use Permit Applications ("Waiahole I")*, 94 Hawai'i 97, 133, 9 P.3d 409, 445 (2000). It also is beyond dispute that public trust doctrine imposes on the State and its political subdivisions a serious and significant duty to

**48.** Although not challenged in the Application, the ICA was correct in its vacation of the circuit court's COL ¶¶ 43, 45, and 59 (the circuit court was clearly erroneous in concluding that Kauai Springs satisfied the relevant permit requirements); and 73 and 74 (the circuit court was clearly erroneous in concluding that the Water Commission and PUC did not raise substantial concerns).

**49.** For example, the public trust doctrine requires an applicant to demonstrate the feasibility

of alternative sources of water. The findings do not indicate whether Applicant complied with this requirement. "[P]ermit applicants must ... demonstrate the absence ... of alternative water sources. Such a requirement is intrinsic to the public trust[.]" *Waiahole I*, 94 Hawai'i at 161, 9 P.3d at 473; *see also Kukui (Molokai), Inc.*, 116 Hawai'i at 496, 174 P.3d at 335 ("The [agency] cannot fairly balance competing interests in a scarce public trust resource if it renders its decision prior to evaluating the availability of alternative sources of water.").

protect the natural water resources of the State. *Kelly v. 1250 Oceanside Partners,* 111 Hawai'i 205, 224, 140 P.3d 985, 1004 (2006).

This case requires us to address how that doctrine should be applied by governmental entities other than the Commission on Water Resource Management (Water Commission), in light of our decision in *Kelly.* The Intermediate Court of Appeals, in addressing that issue, adopted an approach that (1) starts with an analysis of the statutory or regulatory duties placed upon the relevant agency (here, the Kaua'i Planning Commission, or KPC), and then examines the additional duties imposed by the public trust doctrine, and (2) requires the agency to reasonably assess, in light of its regulatory duties, compliance by the applicant with potentially applicable regulatory requirements imposed by other agencies. *Kauai Springs, Inc. v. Planning Comm'n,* 130 Hawai'i 407, 429–33 312 P.3d 283, 305–09 (App.2013). In contrast, the majority's approach requires that the applicant prove that all potentially applicable regulatory requirements, including those applicable to third parties not under the applicant's control, have been satisfied. Majority opinion at 156–78, 324 P.3d at 966–88.

The difference in the two approaches is most clearly highlighted by the question of whether Grove Farm, which supplies the water that Kauai Springs seeks to use, is subject to regulation by the Public Utilities Commission (PUC). The PUC here did not express any interest in regulating Kauai Springs. It noted that it might have a regulatory interest in Grove Farm, but added that additional information was needed to determine whether Grove Farm was a public utility and that a petition for declaratory relief would need to be filed to resolve that matter definitively. Significantly, the PUC's comments did <u>not</u> suggest that water resources would be affected, *Kauai Springs,* 130 Hawai'i at 433, 312 P.3d at 309, but rather expressed interest in Grove Farm's possible function as a public utility, *see* Ha-

wai'i Revised Statutes chapter 269. The ICA held that the significance of PUC regulation was a factual matter that could be resolved by KPC in the first instance. *Id.* at 431–32, 312 P.3d at 307–08. In contrast, the majority holds that Kauai Springs must affirmatively demonstrate that all potentially applicable requirements have been met, effectively requiring Grove Farm—which is not a party to the application—to seek a declaration from the PUC on its status as a utility. Majority opinion at 176–79, 324 P.3d at 986–89. It is unclear, however, how that additional regulatory review will further the purposes of the public trust doctrine. And, if Grove Farm decides not to pursue it, Kauai Springs' application will be at an end.

Thus, the majority's approach appears to require each agency that considers a permit application that affects water resources to ensure compliance with every other agency's potentially applicable regulatory requirements without reference to whether doing so furthers the purposes of the public trust. Respectfully, because I believe that the ICA's approach fully implements the purposes of the public trust doctrine without imposing on applicants additional regulatory requirements that do not have a clear relationship to the protection of water resources, I respectfully dissent from the majority opinion with regard to that issue.[1]

As a preliminary matter, the majority's disposition of this issue—one that essentially affirms KPC's denial of the permit applications, although remanding for entry of findings consistent with the majority's analysis—was not sought in this court by KPC. Indeed, KPC did not challenge the ICA's disposition, which had remanded the case to KPC to apply the principles set forth in the ICA's opinion. To the contrary, counsel for KPC stated at oral argument that the ICA "got it right," and that KPC was satisfied with the ICA's approach. Thus, the approach taken by the majority was not argued for on certiorari by either party.[2] While not a bar to action by this court, this does mean that the

---

1. I concur in the majority's conclusion that Kauai Springs assented to an extension of the time frames for considering the permit applications. Majority opinion at 165–70, 324 P.3d at 975–80.

2. Although Kauai Springs did challenge some of the ICA's rulings on this issue, its purpose in doing so was to have this court affirm the analysis of the circuit court, which found in its favor.

majority is crafting an outcome that neither party sought.

In its analysis of the public trust doctrine, the ICA first held that the doctrine applied to Kauai Springs' use of the water that it was bottling, and not just to Kauai Springs' act of building a bottling facility on agriculturally-zoned land. *Kauai Springs*, 130 Hawaiʻi at 427, 312 P.3d at 303. In so doing, the ICA examined the regulatory provisions applicable to KPC's consideration of the application, and in particular, the manner in which those provisions touched upon water resources. *Id.* at 425–27, 312 P.3d at 301–03. Having determined that the public trust doctrine applied to Kauai Springs' use of the water, the ICA then analyzed whether KPC applied the correct standards and criteria in reviewing the application for the permits. *Id.* at 427–28, 312 P.3d at 303–04. Drawing on this court's analysis in *Kelly*, the ICA noted that the correct starting point was the statutory and regulatory provisions applicable to each of the requested permits' impact on water resources, but it also recognized that the public trust doctrine required more. It then articulated the relevant test as follows:

> that the Planning Commission's decision be initially grounded in the framework of the statutes and regulatory provisions that authorize the Planning Commission to act in this instance; in addition thereto, that the Planning Commission make appropriate assessments and require reasonable measures to protect the water resources at issue in this case; and, because Kauai Springs seeks to use the water for economic gain, this case requires that the Planning Commission give the permit application a higher level of scrutiny and, although Kauai Springs' use of the water is not illegal or improper per se, that Kauai Springs carries the burden to justify the use of the water in light of the purposes protected by the public trust.

*Id.* at 429, 312 P.3d at 305 (emphasis in original).

In reviewing KPC's application of those principles, the ICA noted that the denial of the permits was not specifically based on the many applicable standards and criteria relating to Kauai Springs' use of the water, but rather on whether other entities (Grove Farm and Knudsen Trust) had complied with

potentially applicable regulatory requirements. *Id.* at 431–32, 312 P.3d at 307–08. With regard to that issue, the ICA held:

> it was not a reasonable measure for the Planning Commission to require that Kauai Springs prove that "the proposed use and sale of the water does not violate any applicable law administered by [the Water Commission], the PUC or any other applicable regulatory agency." This requirement creates an obscure and indefinite burden of proof because it is completely open-ended as to the "applicable law" that is of concern to the Planning Commission and completely open-ended as to "any other applicable regulatory agency" that the Planning Commission believes would have jurisdiction relevant to its permit review.

*Id.* at 431, 312 P.3d at 307 (brackets in original).

The ICA repeatedly stated that, although Kauai Springs was not required to initiate separate regulatory proceedings, it nevertheless bore the burden to justify its use of the water in light of the purposes protected by the public trust. *Id.* at 428, 312 P.3d at 304 ("We further recognize that under the public trust doctrine, those seeking the private use of water for economic gain have the burden to justify the use, given the public trust considerations."); *id.* at 429, 312 P.3d at 305 ("Kauai Springs carries the burden to justify the use of water in light of the purposes protected by the public trust."); *id.* at 432, 312 P.3d at 308 (noting that denial of the permit would be appropriate if "Kauai Springs failed to show" that its use of the water would implicate the concerns raised by the Water Commission); *id.* at 433, 312 P.3d at 309 ("Kauai Springs must show that its use of the water for economic gain is justifiable given the public trust purpose."); *id.* ("[T]he Planning Commission can and should require Kauai Springs to carry the burden of justifying its use of water for economic gain in light of the purposes of the public trust.").

There are several significant differences between the approach taken by the ICA and that adopted by the majority. First, the ICA's approach utilizes the applicable statutory and regulatory provisions as the starting point of the analysis, and requires the agency to refer to those provisions in deciding

whether to grant or deny the permit. In contrast, while the majority refers to some of those provisions, they do not figure prominently in its analysis and the majority does not appear to require that KPC explain how they apply to the permits at issue.[3]

This difference is significant because the approach adopted by the ICA establishes the context for applying the broad principles of the public trust doctrine to the specific task faced by the agency. There are a large and diverse array of agencies that might issue permits or approvals that could in some way affect a water resource. Would the Kaua'i building division, in considering a request by Kauai Springs for a permit to expand its facility, be obligated to consider Kauai Springs' use of the water that would be processed in the expanded facility? What if Kauai Springs sought to add a second floor to its processing facility, and wanted to install an elevator to access it—would the Boiler and Elevator Inspection Branch of the Department of Occupational Safety and Health be required to consider the impact of granting an elevator installation permit on water use issues? The answers presumably would depend on the extent to which those agencies had a regulatory interest in water use. Thus, starting the analysis with an examination of the agency's regulatory mandate, as suggested by the ICA, makes sense.

Second, the ICA and the majority take different approaches with regard to KPC's obligation to ensure compliance with other agencies' regulatory requirements. These divergent approaches focus on Conclusion of Law No. 3 in KPC's Findings of Fact, Conclusions of Law, Decision and Order, which provided:

> In view of the comments received from [the Water Commission] and PUC the land use permit process should insure that all applicable requirements and regulatory

processes relating to water rights, usage, and sale are satisfactorily complied with prior to taking action on the subject permits. The Applicant, as a party to this proceeding should also carry the burden of proof that the proposed use and sale of the water does not violate any applicable law administered by [the Water Commission], the PUC or any other applicable regulatory agency.

The ICA characterized the second sentence of this finding as imposing an "obscure and indefinite burden of proof" on Kauai Springs, and concluded that it was not reasonable to require Kauai Springs to initiate regulatory action to establish compliance by Knudsen Trust and Grove Farm with "all applicable requirements and regulatory processes" when the KPC could resolve the relevant issues by making factual determinations. *Kauai Springs*, 130 Hawai'i at 431–32, 312 P.3d at 307–08. In contrast, the majority states that the burden was a reasonable one, when read in light of the concerns expressed by the Water Commission and the PUC, as reflected in KPC's finding that "there may be outstanding regulatory processes ... that [Kauai Springs] must satisfy." Majority opinion at 179, 324 P.3d at 989.

Respectfully, the concerns articulated in this case by the Water Commission and the PUC do not require the initiation of separate regulatory proceedings, but instead can properly be resolved on remand by KPC, with Kauai Springs bearing the burden of proof. *Kauai Springs*, 130 Hawai'i at 432, 312 P.3d at 308. With regard to the PUC, the concern expressed was that Grove Farm might be a public utility subject to regulation by the commission because it distributed water from its system to various users; the PUC suggested that if further clarity on that issue was needed, a declaratory judgment action

---

3. The majority also asserts that the ICA's proposed test ignores or rejects other aspects of the public trust doctrine. Majority opinion at 180, 324 P.3d at 990. However, nothing in the ICA's test forecloses consideration of additional aspects of the public trust doctrine, where applicable. In the instant case, the ICA appropriately focused its analysis on those factors relied on by KPC. *Id.* at 427–34, 312 P.3d at 303–10.

Additionally, it is not apparent why some of the factors discussed by the majority, such as the

need to consider practicable alternative water sources, are relevant to KPC's evaluation of the permit, given that those factors have their genesis in the State Water Code and thereby fall under the duties of the Water Commission, which did not raise any concerns in this regard in the instant case. *See* HRS chapter 174C; *Waiahole I*, 94 Hawai'i at 161–62, 9 P.3d at 473–74.

could be initiated, presumably by Grove Farm. However, as the ICA observed, "there is nothing in [KPC's] order or the PUC's comments that suggests the water resources are in jeopardy or affected without PUC regulation of Grove Farm as a public utility."[4] *Id.*

Additionally, the Water Commission identified several conditions that could require further permitting if they occurred: if the source was modified, a well modification permit might be required; if a pump was installed to induce additional flow, a pump installation permit would be required; and, if the modification results in impact to surface waters, a petition to amend the interim stream flow standard for affected surface waters would be required. However, nothing in the record suggests that any of those things had happened or were planned, and to the extent there is any doubt, those could be resolved as a factual matter by KPC on remand, *id.*, or alternatively, appropriate conditions could be imposed on the permit.

KPC also noted that a concrete stem wall had been constructed and a steel panel installed at the bottom of the tunnel entrance in the mountain, where the water originated that eventually flowed downstream to Kauai Springs. In light of these modifications to the tunnel, KPC opined that there may be "outstanding regulatory processes" with the Water Commission that Kauai Springs was required to satisfy. KPC stated, "[I]t should be [Kauai Springs'] responsibility to confirm

and determine the need for any permits that may be required for the construction of the concrete stem wall and the steel panel mounted over the tunnel entrance." Yet there is nothing in the record to suggest that the stem wall and steel panel were of recent vintage (the water system in question dated to the 1890s, and had been registered with the Water Commission) or that any permits were required.

In sum, the majority establishes a burden that will be difficult if not impossible to satisfy in many cases: the applicant must first prove that all potentially applicable regulatory requirements have been met, including those that involve third parties not under the control of the applicant and agencies other than the one that is considering the application.[5] The public trust doctrine is a centerpiece of this state's efforts to protect its scarce natural resources. The doctrine imposes significant duties on those who would use water resources, and the government agencies charged with protection of those resources. In my view, the approach set out by the ICA appropriately balances the government's weighty responsibilities with respect to public trust resources with the need for a functioning regulatory system. Accordingly, I would affirm the judgment of the ICA.

---

4. Respectfully, the majority is incorrect in stating that this passage improperly shifted the burden of proof from Kauai Springs. *See* dissenting opinion at 179 n. 45, 324 P.3d at 989 n. 45. We have previously held that applicants before the Water Commission have an affirmative duty to demonstrate that their proposed use of water will not interfere with any public trust purpose. *In re Contested Case Hearing on Water Use Permit Application Filed by Kukui (Molokai), Inc.*, 116 Hawaiʻi 481, 508–09, 174 P.3d 320, 347–48 (2007). In addition, the ICA correctly recognized that, in additional circumstances, requiring "compliance with the law by non-parties supplying water may ... be a proper burden if such compliance will help to protect and conserve water[.]" *Kauai Springs*, 130 Hawaiʻi at 433, 312 P.3d at 309. However, we have never held that the public trust imposes a burden to disprove all potentialities unrelated to the protection or conservation of water resources. Here, there is no indication that a declaratory ruling from the PUC was nec-

essary for the protection or conservation of water.

5. It would appear that, in at least some cases, the process of obtaining declaratory rulings to substantiate that all regulatory requirements have been met would exceed the time limits for the permit approval process. Thus, an applicant may be required to seek out such declaratory rulings before filing an application for the desired permit.

Additionally, under the majority's analysis, an agency may be reluctant to issue any type of regulatory clearance until it has assurance that all other regulatory concerns have been resolved. In other words, a permit may be indefinitely delayed because no agency is willing to act first in approving the project, since doing so without assuring that all applicable requirements and regulatory processes relating to the public trust are complied with could constitute a violation of that agency's public trust duties.